IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 11, 2012

## STATE OF TENNESSEE v. TRINIDAD MARTINEZ FLORES

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2341     Seth Norman, Judge**

_____

**No. M2012-00285-CCA-R3-CD - Filed July 11, 2013**

_____

A Davidson County Grand Jury returned an indictment against Defendant, Trinidad Martinez Flores, and six co-defendants. In Count One, Defendant and all co-defendants were charged with conspiracy to sell more than three hundred pounds of marijuana in a school zone. In Count Two, he and two co-defendants were charged with conspiracy to commit money laundering. In Count Five, Defendant and four co-defendants were charged with possession with intent to deliver three hundred pounds or more of marijuana in a school zone. In Counts Six through Sixteen, Defendant and one co-defendant were charged with money laundering. After a jury trial, Defendant was found guilty of the offenses. The trial court sentenced Defendant to twenty years for conspiracy to sell three hundred pounds of marijuana in Count One; eight years for conspiracy to commit money laundering in Count Two; twenty years for possession with intent to deliver three hundred pound of marijuana in Count Five; and eight years for each count of using proceeds from the sale of marijuana to conduct financial transactions with the intent to promote the sale of marijuana in Counts Six through Sixteen. The sentence in Count Two was ordered to be served consecutively to the sentence in Count One; the sentence in Count Five was ordered to be served consecutively to the sentence in Count Two; the sentence in Count Six was ordered to be served consecutively to the sentence in Count Five; and the sentences in Counts Seven through Sixteen were ordered to be served concurrently with the sentence in Count Six for an effective fifty-six-year sentence in the Department of Correction. On appeal, Defendant argues that (1) the evidence was insufficient to support his convictions for possession of marijuana, conspiracy to commit money laundering, and money laundering; (2) the trial judge committed plain error by failing to recuse himself; and (3) the trial court erred by imposing consecutive sentencing. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

James O. Martin, III, Nashville, Tennessee, (on appeal) and Bill Lane, Nashville, Tennessee, (at trial), for the appellant, Trinidad Martinez Flores.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

In February of 2010 the Drug Enforcement Administration (DEA) in El Paso, Texas developed a truck driver as a confidential source (CS). Over the course of several interviews, the CS admitted that he was involved in the distribution or transportation of narcotics, cocaine, and marijuana to various cities and states across the United States. The CS further indicated that he was involved in "picking up the proceeds derived from the sales of these narcotics from various locations and taking it back to Texas, to El Paso, which was smuggled back into Mexico or into Mexico to the drug trafficking organization." The CS also stated that he had delivered approximately 1,000 pounds of marijuana to Tennessee and that he drove to Nashville "at the end of January or the 1st of February, he couldn't recall at that time, and picked up approximately $200,000 and taken it back to Mexico or to Texas where it was smuggled back into Mexico." The CS contacted the DEA again in February of 2010 and said that he had been recruited to drive to Nashville and pick up an additional $200,000 from an individual named "Trini," who was later identified as Defendant. Defendant was the individual in charge of the money in Nashville.

On March 2, 2010, the CS met with Special Agent Dennis Mabry of the Tennessee Bureau of Investigation (TBI), who was assigned to the DEA, and another agent. A series of recorded phone calls were placed to Defendant, and arrangements were made for the CS to meet with Defendant or a representative to pick up the $200,000. Special Agent Mabry explained that Defendant's telephone number had been given to the CS through the "drug trafficking organization in Mexico." The recorded calls were in Spanish and were monitored by Special Agent Mabry and another agent. The other agent translated the calls as they came in. A meeting took place at the Truck Stops of America located off of Exit 62 on Interstate 24 at Old Hickory Boulevard in Davidson County. Special Agent Mabry testified:

Once we decided to have the meeting location, the CS went to that location under our control, a surveillance team was in the area. Over the next several hours there were several phone calls between the individual known as Trini [Defendant] and the confidential source, or truck driver, debating whether it should be done that day or the next day.

At approximately 9:30, [Defendant] had contacted the tractor trailer driver and said that he was going to send a female in his place and she would be driving a Nissan Altima, gray. From that point, a few minutes later, we observed a female driving a gray Nissan Altima that pulled up next to the tractor trailer driver. The tractor trailer driver exited his vehicle and went over to the passenger side of the Nissan Altima and retrieved a boot box, just a big box that you use when you buy boots, which we later determined contained U.S. currency. From that point, the Nissan Altima departed the area and was followed by a surveillance team back to 4612 Arapaho Court here in Davidson County.

\*      \*      \*

From that point the CS was followed to a secure location and we, we being the police, took possession of the boot box containing the U.S. currency, we placed it in an evidence envelope, and the CS was allowed to return to Texas.

Special Agent Mabry testified that the box contained approximately $200,000 which was then forwarded to El Paso, Texas, "in [cooperation] with the DEA in El Paso, which then gave the money back to the [CS] under controlled conditions, and then we delivered it to the organization - - to a representative of the organization so the money was eventually smuggled back into Mexico or in Mexico." Special Agent Mabry testified that the money was allowed to be smuggled back into Mexico in order to "keep the investigation alive so we could target this organization or conduct an investigation because they were a major narcotics distributor in this area." He said that the head of the drug organization lived in Cancun, Mexico.

Special Agent Mabry testified that on March 10, 2010, he requested a warrant for a wire tap order from Judge Seth Norman for Defendant's telephone number that had been supplied by the CS. The request was granted. Agent Mabry testified that on March 12, 2010, there was a series of "court authorized intercepts that occurred in which someone - - the head of the organization contacted the individual known as 'Trini.'" He and other agents conducted surveillance in the area of Interstate 24, Exit 62, and another truck driver arrived at the truck stop and met with the same woman as seen in the earlier transaction with the CS on March 1, 2010. However, the woman was driving a Ford Excursion rather than the Nissan

Altima. Special Agent Mabry testified that the Ford Excursion had been seen earlier at the Arapaho Address. When asked if the truck driver was stopped, Special Agent Mabry testified: "We felt at that time it was too early in the investigation. We knew if we stopped the vehicle, seized the money or arrested the individual, that the telephones would basically be dropped, and we would have to start from scratch or end it." Special Agent Mabry testified that the driver of the Ford Excursion returned to the address at 4612 Arapaho Court in Antioch.

Special Agent Mabry testified that while listening to wiretaps on March 23, 2010, a call was intercepted in which an individual previously known only as "Trini" (Defendant) contacted the Mexican Consulate in Atlanta, Georgia. When the Consulate asked for his full name, the caller replied: "Angel Gabriel Flores Perez." The following day during another call, the same person gave his address as 4612 Arapaho Court. Special Agent Mabry testified that at some point during the drug investigation, he learned that the "source of supply in Mexico" had called Defendant and told him to "get rid of his telephone" due to a drug seizure by the DEA in Chicago. Special Agent Mabry testified that Defendant had a total of three different phones over the course of the investigation for which Special Agent Mabry obtained wiretaps. He explained that individuals in the drug organization would use "Nextel Boost or boost phones. They are just basically disposable phones, they have the Nextel capability or push-to-talk capabilities." Special Agent Mabry further testified that rather than changing their phone numbers, the individuals would "get rid of the entire phone and buy a new phone because they are so cheap and disposable."

Special Agent Mabry testified that in the month of April, he learned through intercepted calls that a tractor-trailer containing approximately 1,500 pounds of marijuana was coming to the Nashville area. He said that an individual flew into Nashville, and they began surveillance on the individual the same morning. However, the individual learned that police were following him, and police backed away hoping to save the investigation. The load of 1,500 pounds of marijuana was diverted to Dickson County, where it was seized by a local drug unit with the assistance of another confidential informant other than the CS originally involved in the case *sub judice*.

In May of 2010, another wiretap was initiated, and on May 5, 2010, a call related to another load of narcotics was intercepted. Special Agent Mabry testified that through court authorized intercepts, it was determined that the drug organization was trying to orchestrate a load coming to Nashville, and they were looking for a new location or a new warehouse facility to use. Special Agent Mabry said:

> There was an individual that later we discovered or identified as Bobby Hunter, who was supposed to get this load of narcotics that was coming to

-4-

middle Tennessee. The head of - - the source of supply, or head of the organization in Mexico, contacted [Defendant] and wanted [Defendant] to look at this warehouse facility located over off of McNally, to see if he was - - they would be happy with that warehouse.

Once they got to that location, we intercepted - - we had a court authorized intercepted call in which Flores contacted the source of supply in Mexico and said that he was happy with the warehouse facility, and he gave some explanation and talked about it, but he mentioned that they had run off into a ditch, and as soon as the tow truck driver got there and got them out of the ditch, they would be able to move locations and go somewhere and look at something else.

From that point, - - I was able to hear the court authorized intercepted call so I go to that location and see a white Escalade that had run off the road into a ditch at the 431 Atlas Drive address. I saw [Defendant] at that location in the passenger's seat, and I saw an individual later identified as Bobby Hunter driving the vehicle. The registration returns to Mr. Hunter. From that point, we were able to determine that, basically, the next tractor trailer load was going to come to that location.

Special Agent Mabry testified that calls continued to be intercepted from May 5 until May 28, 2010. He learned that Defendant was "directing individuals to transfer or wire transfer money from locations, various places across Nashville to Mexico and to the Cancun area, where the source of the supply was." Although he could not identify all of the individuals who helped Defendant, he identified Defendant's ex-wife or girlfriend, co-defendant Gabriela Perez, and co-defendant Gerardo Torres as wiring money to Mexico. Special Agent Mabry testified that Ms. Perez lived at 111 Old Hickory Boulevard off of Interstate 40 in Bellevue.

Special Agent Mabry testified that on the morning of May 28, 2010, co-defendant Bobby Hunter was observed through surveillance "up and moving." Someone from co-defendant Hunter's residence went to "a local area" and rented a U-Haul truck that was taken back to the residence. Co-defendant Hunter then "did some running around to different locations" so agents felt that a load of marijuana would be coming into the area. Special Agent Mabry testified that the U-Haul truck eventually left the residence and went to the warehouse at 431 Atlas Street. Special Agent Mabry drove to Atlas Street and observed a man later identified as co-defendant Phillip Smith with the U-Haul truck. He then left Atlas Street and attempted to locate co-defendant Hunter. Special Agent Mabry said: "I came out at McNally, which hooks up to Atlas, and turned right on Nolensville Road and traveled

south.  I observed - - I saw Mr. Hunter, and he appeared to be escorting a tractor trailer." He said that co-defendant Hunter was driving a Cadillac Escalade that he had previously been seen driving, that was registered to him, and it appeared that co-defendant Hunter was leading the way to Atlas Street with a tractor-trailer following.  There appeared to be only one person in the tractor-trailer.  Special Agent Mabry testified that when he saw the tractor-trailer, it was within 1,000 feet of Croft Middle School.

Special Agent Mabry notified the surveillance team of his observations, and he turned around and began following co-defendant Hunter and the tractor-trailer.  He said that there was only one person in the tractor-trailer.  Special Agent Mabry testified that prior to seeing the tractor-trailer on May 28, 2010:

> In one of the court authorized intercepts, when [Defendant] was in contact with the Mexican telephone or source of supply in Mexico, the source of supply informed [Defendant] that he needed to deposit money into a Bank of America account, and he gave him the name of Baez, Mr. Lazaro Baez.  So [Defendant] was supposed to deposit that money into Mr. Baez's account.

Special Agent Mabry testified that co-defendant Hunter and the tractor-trailer driver drove to 431 Atlas Street, and he drove to a nearby warehouse facility upon a hill in order to observe the area.  Other surveillance units were also in the area.  Special Agent Mabry testified that the tractor-trailer backed up next to the door of the warehouse, and a garage door was opened.  The U-Haul was also backed up so that the trucks were "back to back."  Special Agent Mabry observed individuals "walking around the truck and begin throwing items from the tractor trailer into the U-Haul, [in] bundles or bales."  He said:

> Then at that point, we decided that - - we knew based off court authorized intercepts that marijuana was coming here, we knew they were using that location, and we knew that that was the marijuana.  We moved in, and conducted an arrest or takedown.
>
> *       *       *
>
> When I pulled up to conduct the arrest or takedown situation, I arrested an individual named Trujillo Duarte.  I took him into custody.  He was standing beside - - on the west - - if I'm facing the U-Haul truck, he was facing the left side.
>
> As we pulled up, he knew that the police had arrived.  He reached up and tried to pull down the door, the overhead door to the U-Haul trailer, but I placed him

-6-

into custody. I went back to the right, and I saw three individuals that were in the tractor trailer itself, the trailer portion of the tractor itself. One of those individuals was Bobby Hunter, another one was identified as Phillip Smith on that date, and Mr. Baez was also in that trailer.

Special Agent Mabry testified that after everyone was taken into custody at Atlas Drive, he and others proceeded to co-defendant Hunter's residence near Nolensville Road to conduct a search. At the residence, agents found a handgun, large digital scales commonly used to weigh marijuana for distribution, and bundles of rubber bands, which were commonly used to bundle U.S. currency to send back to drug dealers. According to information from the investigation, co-defendant Hunter was to receive the shipment of marijuana.

After searching co-defendant Hunter's residence, Special Agent Mabry testified that he and other agents proceeded to co-defendant Gabriela Perez's apartment at 111 Old Hickory Boulevard. Special Agent Mabry testified that she was involved in the distribution of money or wire transfers for Defendant's group. Numerous copies of wire transfers and "a little bit under $10,000" were found at co-defendant Perez's apartment. Co-defendant Perez indicated that the currency did not belong to her. Based on intercepted calls, Special Agent Mabry testified that Defendant did not keep all of the money with him because he would contact co-defendant Perez and tell her to wire certain amounts of money. A table of calls was prepared that corresponded with those wire transfers which were the basis for Counts six through sixteen of the indictment. Special Agent Mabry reviewed each wire transfer receipt and call from the table where Defendant was either instructed to make the wire transfer or where he contacted co-defendant Perez to direct the transfer.

Through intercepted calls, Special Agent Mabry learned that Defendant had found out about the "takedown" and moved from his address at 4612 Arapaho Court to a residence in Springfield located at 4502 Roy Cole Drive. The decision was then made to take Defendant into custody. Special Agent Mabry testified that a search warrant was executed on July 1, 2010, at the Springfield residence, and Defendant and co-defendant Gerardo Torres were arrested. During the search of Defendant's residence, additional wire transfer receipts were found for transfers made to locations in Mexico. Special Agent Mabry testified concerning the receipts and corresponding phone calls. A vehicle registered to co-defendant Perez was also found at the residence. Special Agent Mabry testified that a document was seized during the search containing a "telephone number, or an account number, that has got Gabriela Perez on it and the amount, 6,145." He explained that a FedEx shipping bill was found at the residence with Gabriel Flores as the recipient. It was believed that Defendant also went by that name, and the bill listed the address of 4612 Arapaho Court. Special Agent Mabry testified that the shipping bill was consistent with a telephone call that was intercepted on

March 24, 2010, concerning shipment of a hat. He said some documents were also found bearing the name of co-defendant Lazaro Baez with some amounts written on them, and there was also what appeared to be a "tally sheet or a bookkeeping idea commonly used by narcotics dealers to keep up with narcotics going out and money coming in." Defendant later admitted that he was involved in a drug trafficking organization and that he was the "money side" of the organization.

Special Agent Mabry testified that he intercepted "at least 1,000" calls over the course of the investigation. A portion of the calls were selected to illustrate Special Agent Mabry's testimony, and two transcripts of the calls were admitted into evidence. Special Agent Mabry testified as follows concerning those calls.

**Calls from May 1, 2010**

*Call #119, 12:47 p.m. Central Time*

An unknown female answered the phone, and Defendant asked for Don Pachin. The female then replied, "Oh, we are carrying some boxes in Shelbyville[.]" Defendant said that his "son's mother" was waiting for [Mr. Pachin] in Nashville with one box." The female replied, "Yes, we are going to carry this, and then we are going to go there." Defendant then told the woman to call when they were "at the 199" where they could meet. Defendant also gave the woman a phone number of "615-578-7384" and the name "Gabriela." The woman then asked if "he" was supposed to call "Gabriela" when they were "at 199," and Defendant replied, "Yes." Concerning the call, Special Agent Mabry testified:

> I felt like based off of my training, knowledge, experience through this investigation that there is money going to be exchanged. They are talking about a box, and money was going to be given to Gabriela. They were going to Exit 199, off Interstate 40, and meet when they got there.

He said that Exit 199 off of Interstate 40 was very close to Gabriela Perez's residence.

*Call #130, 3:35 p.m. Central Time*

An individual named "Pachin" called Defendant and asked, "Is the box very large?" Defendant responded, "No, it is just a little box." Pachin then said, "Ah, good let's talk - - let me talk to - - tell him/her to call me." Defendant indicated that he would have "him/her" call "Pachin."

*Call #131, 3:36 p.m. Central Time*

Defendant called co-defendant Perez and told her to call "Pachin." Co-defendant Perez replied, "Oh, but I am going to see him in the Marco [sic] in the gas, leaving the 199." Defendant then told co-defendant Perez to "[t]ell him that it is small." Co-defendant Perez also said, "Hey, it's ready, it has arrived." She then agreed to call "Pachin." Regarding the call, Special Agent Mabry testified that co-defendant Perez was supposed to meet "Pachin" at the Mapco gas station at Exit 199. Special Agent Mabry also testified that no arrests were made at the time of the money transfer because they thought it was a small amount of money being transferred on May1, 2010, and they "didn't want to blow the whole investigation over a small amount of money."

**Calls from May 5, 2010**

*Call #626, 11:20 a.m. Central Time*

Defendant called "Chicaharo," who was identified as "the head of the organization, the source of supply in Mexico." Defendant indicated that he saw "Temo" who gave him "Four pesos." "Chicaharo" then instructed Defendant as to the following, ". . . Leave Bobby's [co-defendant Hunter's] radio so they can take it to the land, and he is going to take you to a warehouse that he rented so you can tell me if it is good or not." In interpreting the call, Special Agent Mabry testified:

> Basically, this is when Mr. Hunter locates the warehouse at 431 Atlas, and the head of the organization wants [Defendant] to go out and do an inspection to make sure everything is cool here and get his approval so they can make a shipment of marijuana to Nashville.

*Call #677, 2:00 p.m. Central Time*

Special Agent Mabry testified that Defendant called "Chicharo" concerning the warehouse and said: "I was just with this guy 'Bush.'" Hey I am here with the white guy, the white guy, no, the place is great. It is awesome, it is really - - . . . B-I-T-C-H-I-N-G here. It is like 6,000 by 6,000 feet. That is how big it is, . . ." Special Agent Mabry testified that the following exchange then took place:

> Chicharo laughs and says, The place is good then?
>
> And [Defendant] replies, Yes, it is awesome, awesome, it is rentable. It is [unintelligible] but they are going to be late with the part with the wood I say,

because sometimes it has all of the tools and it has I don't know what I say, [unintelligible]. Later in the afternoon the dude is coming to do the contract for the warehouse.

Chicharo replies with, Perfect.

[Defendant] replies with, Hey what about the land, you said you wanted like 250,000 bars for it right?

Chicharo replies, I told him to pay the 50,[ ], because we owe him 100 balls from a job that we had like five years ago.

Flores replies with, Ah, okay, that's okay. So he was telling me that we are going to, [ ], here, if here they do the check or do they send cash. I have to investigate that and it seems to me as if it were a doctor's right?

Chicharo replies, Let me talk to the Chilango. Let me invite him to work and when he - - Let me talk to Chilango and when he arrives and for the next week, [ ], next week and I will grab it.

[Defendant] replies, oh yes, I'm going to take him so he can look at it, [ ], he said yes, and that you said it was 250,000 balls, we can have it appraised, but if it is like that by the Galatin, [sic], and the Old Hickory then it is worth some money, like 150 [-] 200 balls.

Chicharo replies, okay.

[Defendant] relies, Yes I will take here as soon as the tow truck arrives to take it out.

Chicharo replies, All right then.

Special Agent Mabry testified that at the time of the call, Defendant was in a vehicle with co-defendant Hunter that had run off the road at the entry of 431 Atlas Drive. Special Agent Mabry interpreted part of the conversation that referred to owing someone "100 balls from a job" as indicating that it was a drug debt from a prior transaction. He said, "It is coded language. It is common among narcotic traffickers to use coded language when on the telephone."

*Call #689, 3:38 Central Time*

Defendant asked Chicharo how long they will "need where they are going to put the wood" or the "material for the warehouse." Chicharo then indicated that it would be there for three or four hours, and they were going to rent the warehouse for three months. He further said that he would need the warehouse for the following Monday.

In interpreting the call, Special Agent Mabry testified:

They are basically talking about how long they are going to need it, they are going to rent it for three months, the materials, meaning the narcotics, that are coming to town. He says no, but he wants to - - Chicharo wants to speak with someone else in the organization before that, but he needs it for Monday.

*Call #690, 3:39 Central Time*

Defendant told Chicharo that "that guy will try to do the contract this afternoon." However, Chicharo said that he needed to "talk to the Chilango first."

**Calls from May 8, 2010**

*Call #899, 1:55 p.m. Central Time*

Defendant's juvenile son answered the phone, and co-defendant Perez said, "Son, ask your dad if I am supposed to send Mingo's to Cancun as well." Defendant's son replied, "Both of them to Cancun." Co-defendant Perez then indicated that she was looking for a Western Union "because all of them were down[.]" Special Agent Mabry testified that the call referenced wire transfers to Cancun, Mexico.

*Call #916, 537 p.m. Central Time*

Defendant received a call from "Mingo" and said that he needed to give Mingo some codes. Defendant then gave Mingo code number 0266481705 and said, "The sender is Luis Alvarado Hernandez." Defendant also gave "Chayo" as the recipient. Defendant gave "Mingo" a second code number of 5045563544 for the same amount, and he indicated that the sender was co-defendant Perez, and Mingo was the recipient. Defendant indicated that both wire transfers were sent "Western Union, Elektra." The numbers and senders of the wires transfers corresponded with the chart prepared by Special Agent Mabry and Count Six of the indictment.

**Calls from May 9, 2010**

*Call #1084, 4:43 p.m. Central Time*

Defendant called "Danny" and said that he would give Danny the code.  The call ended while Danny was looking for a pen.

*Call #1085, 4:44 p.m. Central Time*

Danny called Defendant back, and Defendant gave him a code number of 271018133220 and the name of co-defendant Perez.  Defendant also mentioned an amount of 1,926.  Danny also asked for Defendant's address to send him the "recipe book."  Special Agent Mabry testified that the numbers given by Defendant and Danny related to wire transfers.

**Calls from May 26, 2010**

*Call #2857, 6:10 p.m. Central Time*

Defendant called co-defendant Gerardo Torres. Co-defendant Torres told Defendant that he had just arrived in a car, and Defendant said that "Yahaira" would give him five pesos.  Defendant then said that he would give Yahaira's number to co-defendant Torres. Special Agent Mabry testified that a peso is worth approximately a penny in U.S. currency. Based on his training and experience, he concluded that Yahaira would be giving co-defendant Torres $500 rather than five pennies, "just based off of the wire transfers" and a receipt that was found for $500.  He said that Defendant and co-defendant Torres were talking in code.

*Call #2862, 7:01 p.m. Central Time*

Defendant called co-defendant Torres and asked if the "girl" had called him, and co-defendant Torres replied, "Yeah she call[ed] me."  Co-defendant Torres further stated "that in a half an hour she would wait for him at Cazuelas."  Defendant then said, "When you grab that, tell me so I can do something."

*Call #2863, 7:16 p.m. Central Time*

Co-defendant Torres called Defendant and said, "I [,] have them with me." Defendant then told him to go to the "Arabic store" and send a "little money" to "by where the girls are."  Defendant and co-defendant Torres agreed that co-defendant Torres would go to

"Limber[spelled phonetically]." Special Agent Mabry testified that there is a Linbar Road in Nashville near Defendant's residence on Arapaho Drive.

*Call #2864, 7:21 p.m. Central Time*

Agent Mabry testified that during a call between Defendant and co-defendant Torres, the following exchange took place:

[Co-defendant] Torres says, Buddy, now, now yes. Tell me how much, how much are you going to send to take out from here?

[Defendant] says, Send, um 400, 490.

[Co-defendant] Torres says, 490?

And [Defendant] responds with, Yes or 480 send, no more. The - - you are going to send 480 but take out 500.

[Co-defendant] Torres says, Because there is here three packet of five's but it look out one - - I took out one. Three packet of five's but I took out one.

And [Defendant] responds, Yes, exactly. Well the one you took from there.

[Co-defendant] Torres replies, Yes.

Defendant says, Put four of - - do you have something to write the names of the girl?

And [co-defendant] Torres replies, no wait that is why, let me, let me, let me. I have to count the money there. I am going to go inside the store and I will tell you.

[Defendant] responds with, Just clear well that and put it in the car.

[Co-defendant] Torres replies, Uh-huh. That is fine.

\*       \*       \*

[Defendant] responds with, Is it real bulky?

-13-

[Co-defendant] Torres responds with, No, almost no. It's pure twenty's.

[Defendant] responds with, If it's to much to put in the bag - - it doesn't fit all in the bag up front?

[Co-defendant] Torres says, No. But that is fine.

[Defendant] responds with, It is well secured?

[Co-defendant] Torres says, Yes.

Defendant then gave co-defendant Torres the name of Azusensa Morales and told him to "send it to the City of Cuauhtemoc" by Intermex or "send via Soriana."

*Call #2865, 7:29 p.m. Central Time*

Co-defendant Torres told Defendant that he had the tracking number and asked if Defendant wanted it while they were on the phone or when Mr. Torres arrived home. Defendant indicated that he was talking on another line and would call back. Special Agent Mabry testified that it appeared from the conversation that Defendant and co-defendant Torres lived together at the time.

*Call #2882, 8:23 p.m. Central Time*

Defendant called co-defendant Torres and said, "Hey are you bringing the tracking number there?" Co-defendant Torres replied, "Yes, buddy but I am driving. Do, do you want the tracking number or what?" Defendant then asked how long it would be until co-defendant Torres arrived home. He ultimately told co-defendant Torres to give him the tracking number at the house.

*Call #2896, 9:30 p.m. Central Time*

Defendant received a call from "Mingo," and gave Mingo a tracking number of K271018279991. Defendant indicated an amount of 6,235, and the sender would be Geraldo Vargaran-Torres. He directed Mingo to collect it in Soriana, a state in Mexico.

*Call #2900, 9:39 Central Time*

Defendant received a call from "Cesar, Juanitos brother." Cesar said, "I was talking to the 'namesake,' and he said to give you an account number so you can deposit first thing tomorrow the $2,500, and so you can send the money to Guadalajara for $1,000."

*Call #2901, 9:40 Central Time*

Defendant called Cesar who said,

> I spoke with him, and he already knows. If you want, you call and ask him. [Unintelligible] an account, with a Bank of America. So you can deposit tomorrow 2,500, and the other $1,000 you can send by Western Union, by Electra to Guadalajara.

*Call #2903, 9:41 Central Time*

Defendant called Cesar and said, "Give me the account number." Cesar gave him a Bank of America account number of 8580517 in the name of co-defendant Lazaro Baez. Special Agent Mabry testified that the account number was the same number that he had seen written down on a piece of paper found at Defendant's residence on Roy Cole Road in Springfield. The purpose of the call was for a deposit of $2,500.

Sergeant Adrian Breedlove, a detective with the Brentwood Police Department assigned to the DEA, received a call from his supervisor on May 28, 2010, directing him to the area of Atlas Drive off Nolensville Road in Nashville to look for a tractor-trailer. Sergeant Breedlove drove to the area and saw a tractor-trailer backed up to a small warehouse. He also saw several bales of marijuana being tossed out of the tractor-trailer into a U-Haul truck. Sergeant Breedlove testified:

> I met with Special Agent Mabry and we got together at a location close by, one of the other warehouses close by, and we got our police vests so we were clearly marked as police officers. I got my AR-15 ready, and then when the signal was said to go, several of us in different cars drove into the parking lot.

> As I came up in my vehicle I turned on my blue lights and came down that passenger side of the tractor trailer that was shown in that photograph and ended up there kind of at the back of the trailer, up against the warehouse.

> \*       \*       \*

-15-

When I first arrived the only person I saw was Duarte. Then as we were getting him, we saw - - I saw, myself saw, a couple or three people come out of the trailer, and Mr. Baez was one of the people that came out of the trailer.

*    *    *

As I was driving up, I saw Mr. Duarte there in the back passenger's side of that trailer as it was backed in, on the side that I was driving up on. As I was driving up and turned my blue lights on, Mr. Duarte - - it was almost slow motion the way he did it, but he just kind of reached behind him and started to pull the U-Haul door down just kind of slowly. He just pulled the thing down, and he turned back around and looked at me.

Sergeant Breedlove took photographs of the scene and helped get the bales of marijuana that were still in the tractor-trailer. A total of eighty-seven bales of marijuana were seized. On cross-examination, Sergeant Breedlove testified that Defendant and co-defendant Torres were not present at the warehouse.

DEA Special Agent James West transported the marijuana to the Metro Nashville Police Department's property room where he inspected and weighed each bale of marijuana. He also took core samples from ten randomly selected bales that were then sent to the DEA lab for testing. The gross weight of the marijuana seized, including the wrapping, was 1,037 pounds. Greg Burgess, a forensic chemist with the DEA lab, tested the samples which proved to be marijuana.

Detective Merrill Beene, of the Murfreesboro Police Department and also assigned to the DEA, testified that he conducted surveillance on the Atlas Drive warehouse prior to the drug seizure. He drove to Green Mountain Transportation, located on a hill, in order to observe the warehouse. Detective Beene could see the backside of the warehouse and observed the U-Haul truck pull in. He said:

[T]he male exited the U-Haul truck and opened the gate, and then he closed the gate back. He drove to the far-right door, and he walked to the middle door, it's a door that you open, and unlocked the door and went inside, then he opened up the big door and then drove inside.

Detective Beene testified that the man remained inside the warehouse for approximately one hour until a white Escalade and a tractor-trailer arrived. The bay door opened, and the tractor-trailer backed up to the door. Four or five minutes later, a "blue

Sunfire vehicle" arrived and a black male and a white male exited that vehicle. The white male remained at the warehouse for "maybe a minute or two" and then got back into the car and drove away. Detective Beene testified that the tractor-trailer driver then exited his truck, and everyone proceeded to the back of the tractor-trailer and the U-Haul truck. Detective Beene then saw objects being thrown from the tractor-trailer into the U-Haul. He transmitted his observations to the other officers involved in the investigation. Detective Beene testified that when he arrived at the warehouse, everyone had been taken into custody.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant argues that the evidence presented at trial was insufficient to support his convictions for possession with intent to deliver three hundred pounds or more of marijuana in a school zone in Count Five, conspiracy to commit money laundering in Count Two, and money laundering in Counts Six through Sixteen. We disagree.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id*. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

### Possession of Marijuana as Charged in Count Five

Defendant asserts that there was no evidence presented to show that he was in the warehouse where the marijuana was seized and that there was no evidence to show that he was ever in actual possession of the marijuana seized by agents on May 28, 2010.

It is an offense for a defendant to knowingly possess a controlled substance with the intent to manufacture, deliver, or sell the controlled substance. Tenn. Code Ann. § 39-17-417 (a)(4). The term "possession" encompasses both actual and constructive possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). In order for a person to "constructively possess" a drug, that person must have "'the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others.'" *Id.* (quoting *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). Additionally, "it may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419.

In *State v. Henry A. Edmondson, Jr.*, No. M2005-01665-CCA-R3-CD, 2006 WL 1994534 (Tenn. Crim. App., July 18, 2006), *perm. app. granted* (Tenn. Nov. 20, 2006), a panel of this court stated:

> We also note that possession of a controlled substance can be either actual or constructive. In interpreting possession as it applies to drug possession, this court has concluded a defendant can be in possession of narcotics even if not present where the drugs are located. *See State v. Brown*, 823 S.W.2d 576, 578-80 (Tenn. Crim. App. 1991) (concluding the defendant was in constructive possession of drugs found at a house next door to the garage where the defendant worked because the defendant had a key to the house, had been seen going to and from the house, and was present in the garage when the house was searched); *see also United States v. Coffee,* 434 F.3d 887, 897 (6th Cir. 2006) (concluding the defendant possessed cocaine and marijuana that was found in a house the defendant leased even though the defendant was not present during the search that revealed the presence of the drugs).

In this case, a confidential source (CS) admitted that he was involved in the distribution or transportation of narcotics, cocaine, and marijuana to various cities across the United States for a drug trafficking organization and that he had previously delivered approximately 1,000 pounds of marijuana to Tennessee and picked up approximately $200,000 and taken it back to Mexico. The CS contacted the DEA in February of 2010 and said that he had once again been recruited to drive to Nashville and pick up an additional $200,000 from an individual named "Trini," who was later identified as Defendant. It was undisputed at trial that Defendant was the "money man" of the drug trafficking organization. On March 2, 2010, the CS had several recorded conversations with Defendant about where to deliver the money, and arrangements were made for the CS to meet with Defendant or a

representative to pick up the $200,000. The CS later met with a woman and received a boot box containing the currency which was then taken back to Mexico.

Later, through a series of intercepted calls, it was discovered that Defendant received information to coordinate the delivery of a large load of marijuana on May 28, 2010, coming from Mexico. The content of several of those phone calls was read into evidence at trial. Concerning Defendant's role in the delivery, Special Agent Mabry testified:

> Through court authorized intercepts, we determined that they were trying to orchestrate a load coming to Nashville. They were looking for a new location or a new warehouse facility to utilize; one, the police knew about when I was seeing it on surveillance and; second, the one that we knew about was burned, I guess basically, when the police in Dickson had arrested those individuals over there.
>
> We knew through court authorized intercepts that they were looking for a new warehouse facility. There was an individual that later we discovered or identified as Bobby Hunter, who was supposed to get this load of narcotics that was coming to middle Tennessee. The head of - - the source of supply, or head of the organization in Mexico, contacted [Defendant] and wanted [Defendant] to look at this warehouse facility located over off of McNally, to see if he was - - they would be happy with that warehouse.
>
> Once they got to that location, we intercepted - - we had a court authorized intercepted call in which [Defendant] contacted the source of supply in Mexico and said that he was happy with the warehouse facility, and he gave some explanation and talked about it, but he mentioned that they had run off into a ditch, and as soon as the tow truck driver got there and got them out of the ditch, they would be able to move locations and go somewhere and look at something else.
>
> From that point, - - I was able to hear the court authorized intercepted call so I go to that location and see a white Escalade that had run off the road into a ditch at the 431 Atlas Drive address. I saw [Defendant] at that location in the passenger's seat, and I saw an individual later identified as Bobby Hunter driving the vehicle. The registration returns to Mr. Hunter. From that point, we were able to determine that, basically, the next tractor trailer load was going to come to that location.

Prior to the delivery on May 28, 2010, a call was intercepted in which the source of supply in Mexico informed Defendant that he needed to deposit money into a Bank of America account in the name of co-defendant Lazaro Baez, who was the truck driver for the load of marijuana.

Through calls that were intercepted from May 5 until May 28, 2010, Defendant directed various individuals to transfer or wire money from various places in Nashville to the Cancun area where the head of the drug organization lived. After he was later taken into custody, Defendant admitted that he was involved in a drug trafficking organization and that he was the "money side" of the organization. At Defendant's residence on Roy Cole Drive, agents found a document where Defendant had written down co-defendant Baez's name as well as an account number.

From the phone calls that were intercepted, the evidence of wire transfers, and Special Agent Mabry's testimony, a jury could reasonably infer that Defendant was in constructive possession of 300 pounds or more of marijuana with intent to deliver, and was therefore guilty of the charged offense beyond a reasonable doubt.

*Conspiracy to Commit Money Laundering as Charged in Count Two*

Defendant argues that the evidence was insufficient to support his conviction for conspiracy to commit money laundering because there was no proof that the money involved in the wire transfers was from the sale of marijuana.

Tenn. Code Ann. § 39-12-103 provides:

(a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

(b) If a person guilty of conspiracy, as defined in subsection (a), knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense, the person is guilty of conspiring with the other person or persons, whether or not their identity is known, to commit the offense.

(c) If a person conspires to commit a number of offenses, the person is guilty of only one (1) conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship.

(d) No person may be convicted of conspiracy to commit an offense[ ] unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

*Id*. § 39-12-103(a)-(d). To prove the existence of a conspiratorial relationship, the State may rely upon a "mutual implied understanding" existing between or among the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). The conspiracy need not be proved by production of an official or formal agreement, in writing or otherwise. *Id*. The conspiracy may be demonstrated by circumstantial evidence and the deportment of the participants while undertaking illegal activity. *Id*. Conspiracy connotes harmonization of design, not coequal participation in the minutia of every criminal offense. *Id*.

Concerning the offense of money laundering as charged in Count Two:

It is an offense to knowingly use, conspire to use or attempt to use proceeds derived directly or indirectly from a specified unlawful activity to conduct or attempt to conduct a financial transaction or make other disposition with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds.

T.C.A. § 39-14-903(a)(1). Furthermore:

"Knowingly uses or attempts to use proceeds derived directly or indirectly from a specified unlawful activity" means that any person or party to the transaction or act knew that the property or proceeds involved in the transaction or act represented or constituted, either in whole or in part, proceeds from some form, though not necessarily which form, of any criminal offense under the laws of this state, or any other jurisdiction.

*Id*. § 39-14-902(3); *see State v. Elliot*, 366 S.W.3d 139, 145-46 (Tenn. Crim. App. 2010). The Code defines "specified unlawful activity" as "any act, including any preparatory or completed offense, committed for financial gain that is punishable as a felony under the laws of this state." *Id*. § 39-14-902(5)(A).

The State presented sufficient evidence from which the jury could infer that Defendant conspired with co-defendants Gabriela Perez and Gerardo Torres to transfer to Mexico the

proceeds from the illegal sale of marijuana. The evidence was sufficient to show that Defendant and his co-defendants were involved in the transfer of marijuana from Mexico into Tennessee and that Defendant was the "money man" for the drug trafficking organization, and he was in contact with the head of the drug trafficking organization in Mexico.

The CS told agents that he delivered a load of approximately 1,000 pounds of marijuana in late January or early February of 2010 to Tennessee and picked up approximately $200,000 that was smuggled back into Mexico. The CS drove to Nashville in February of 2010 to pick up an additional $200,000 from Defendant or one of his representatives. After several phone calls between Defendant and the CS about whether the transaction should occur that day or the following day, Defendant indicated that he was going to send a female in his place who would be driving a gray Nissan Altima. The CS obtained the money from the female at a Truck Stops of America. The money was concealed in a boot box, and the woman was driving a gray Altima. The female was followed back to 4612 Arapaho Court. The money was eventually smuggled back into Mexico where the head of the drug organization lived. Agents observed the same woman meet with another truck driver at a truck stop on March 1, 2010. She was driving a different vehicle that had also been seen at the residence where Defendant had been living on Arapaho Court.

Special Agent Mabry testified that based upon intercepted calls, the drug organization was attempting to orchestrate a load of marijuana coming to Nashville. He said that Defendant contacted the source of supply in Mexico and indicated that he was happy with the warehouse facility. Special Agent Mabry drove to the area of the warehouse and observed Defendant and co-Defendant Bobby Hunter who had run off into a ditch at the warehouse. Special Agent Mabry testified that calls were intercepted from May 5 until May 28, 2010. During that time, Defendant was "directing individuals to transfer or wire transfer money from various places across Nashville to Mexico and the Cancun area where the source of the supply was located." Although Special Agent Mabry was unable to identify all of the individuals who helped Defendant, he identified co-defendants Perez, who was Defendant's ex-wife or girlfriend, and Gerardo Torres, as persons who wired money back to Mexico.

Special Agent Mabry testified that prior to the delivery of marijuana on May 28, 2010, the person who was the source of the drug in Mexico instructed Defendant to deposit money into co-defendant Baez's Bank of America account. After the marijuana was seized on May 28, 2010, agents proceeded to co-defendant Perez's apartment where numerous copies of wire transfers and "a little bit under $10,000" were found. Special Agent Mabry reviewed the wire transfer receipts at trial and the content of calls where Defendant was either instructed to make the wire transfer or where he contacted co-defendants Perez or Torres to direct the transfer. A search warrant was executed on July 1, 2010, at the residence where

Defendant had moved to on Roy Cole Drive, and Defendant and co-defendant Torres were arrested. Additional wire transfer receipts were found for transfers made to locations in Mexico, and Special Agent Mabry testified concerning the receipts and corresponding phone calls. A vehicle registered to co-defendant Perez was found at the residence. Special Agent Mabry testified that a document was seized containing "a telephone number, or an account number that has got Gabriela Perez on it and the amount of 6,145." A FedEx shipping bill with Defendant's name as the recipient and an address of 4612 Arapaho Court was found which was consistent with a phone call intercepted on March 24, 2010, concerning where to ship a hat. Special Agent Mabry testified that documents were found bearing the name of co-defendant Baez with some amounts written on them, and there was also what appeared to be a "talley sheet or a bookkeeping idea commonly used by narcotics dealers to keep up with narcotics going out and money coming in."

Based on the foregoing analysis, the evidence was sufficient to support Defendant's conviction for conspiracy to commit money laundering.

*Money Laundering Counts Six through Sixteen*

Defendant also argues that the evidence in Counts Six through Sixteen was insufficient to show that the money involved in the wire transfers was from the sale of marijuana. We disagree.

Tennessee Code Annotated section 39-14-903(b)(1) provides: "It is an offense to knowingly use proceeds derived directly or indirectly from a specified unlawful activity with the intent to promote, in whole or in part, the carrying on of a specified unlawful activity."

As previously discussed, evidence was presented at trial to show that Defendant was involved in a drug trafficking organization and that he and co-defendants Perez and Torres were involved in a conspiracy to launder money, which was the proceeds of the illegal drug business. The transcripts of the phone conversations involving Defendant and co-defendants Perez and Torres were admitted at trial along with copies of the wire transfer receipts. The wire transfer receipts were then put into the form of a chart with the corresponding telephone calls concerning those wire transfers. As pointed out by the State, transcripts of the telephone conversations involving Defendant and co-defendant Perez were admitted at trial and considered by the jury.

**Count Six**

Defendant and co-defendant Perez were charged with transferring $1,800 through Western Union on May 8, 2010. In the three phone calls supporting the transaction, on May

8, 2010, a person identified at "Chicaro" asked Defendant to send "about [two] bucks to Cancun [Mexico] under the name, Mingo and Chayo." In the next call, Defendant asked a woman identified as "Gabriela" to wire money to Domingo Marales Najera and Rosario Lopez Villalobos in Cancun. Each of the transfers was for nine hundred dollars. Defendant and Gabriela agreed that Gabriela would conduct the transfer and "Tono" would do "the other." During the third call, Defendant gave "Mingo" the PIN numbers for the two wire transfers.

The two wire transfer receipts listed for Count Six indicate two wire transfers on May 8, 2010, in the total amount of $1,800 sent by co-defendant Perez and Luis Alvarado to Domingo "Mingo" Morales and Rosario Lopez in Cancun, Mexico.

### Count Seven

Defendant and co-defendant Perez were charged with transferring $900 on May 15, 2010. In the call supporting the charge, a person identified as "Willey" asked co-defendant Perez "how did she send it. Gabriela said Western Union." Defendant was heard talking in the background. The receipt listed for Count Seven was sent by co-defendant Perez on May 15, 2010, by Western Union.

### Counts Eight and Nine

Defendant and co-defendant Perez were charged with two wire transfers of $900 each on May 17, 2010. There were four calls listed as supporting the charges. In the first call, Defendant said that "he was going to do it right now and asked if [Mingo's] wife's name was Rosario Lopez-Villalobos. Mingo said yes." In the second call, co-defendant Perez called Defendant's phone and left two PIN numbers for Defendant with someone named "Karol." One was for a wire transfer to Lisette Erives Mercado: 6289862142; and the other was for Rosario Lopez-Villalobos: 2728065191. During the third call, "Karol" passed the PIN numbers to someone identified as "UM" who asked if the transfers should be made by Western Union or Soriana and "'Karol' said Soriana." In the fourth call, "Karol" used Defendant's phone to call "Mingo" and give him the PIN for one of the transactions, 2728065161, which was sent by Western Union from co-defendant Perez to Rosario Lopez.

The wire transfer receipt listed for Count Eight reflected a transfer by Western Union from co-defendant Perez to Rosario Lopez Villalobos on May 17, 2010 with a PIN number of 2728065151. The transfer receipt for Count Nine indicated that the sender was co-defendant Perez, and the receiver was Lizette Erives Mercado with a PIN number of 6289862142. As pointed out by the State, although Defendant was not a party to the calls concerning the transfers, the "jury could reasonably infer that 'Karol' acted as the

defendant's agent as she answered his telephone and passed along the information to make the transfers."

**Count Ten**

Defendant and co-defendant Perez were charged with transferring $900 on May 18, 2010, through Sigue, LLC. In the call supporting the charge, Defendant asked co-defendant Perez about a money wire, and co-defendant Perez "said the sender was Gabriela Perez and the receiver was Rosario Lopez-Villalobo. Gabriela said the pin was 8509410173 . . .via Sigue."

The transfer receipt for Count Ten indicated that the sender was co-defendant Perez, and the receiver was Rosario Lopez Villabos. The transfer amount was $900 with a PIN number of 8509410173 through Sigue, LLC.

**Count Eleven**

In Count eleven, Defendant and co-defendant Perez were charged with transferring $490 on May 18, 2010, through Sigue, LLC. In the first call supporting the charge, "Karol" used Defendant's phone to tell "Mingo" that Defendant was at the dentist and asked if she could take a message. "'Mingo' told 'Karol' to have [Defendant] send 500 dollars to his sister, Mario Isabel Morales Nachera in Ciudad Cuatehmoc [Mexico]." During the second call, "Karol" asked co-defendant Perez to do a wire transfer. She identified the receiver as Maria Isabel Morales Najera in Cautemoc, Chichiuahua to be sent through Soriana. In the third call, Defendant gave a PIN to an individual identified as "Mari" with a PIN number of 8509410172.

The wire transfer receipt for Count Eleven indicated that co-defendant Perez wired $490 to Maria Morales Najera with a PIN of 8509410172 through Sigue, LLC.

**Count Twelve**

Defendant and co-defendant Perez were charged with wiring $900 on May 18, 2010, through Intermex. In the call supporting the charge, Defendant asked co-defendant Perez for a tracking number, and she gave him a number of 40322334233. The recipient was Mingo Morales, and the sender was co-defendant Perez. The transfer was made through Intermex.

The receipt supporting the charge indicated that co-defendant Perez wired $900 to Domingo Morales Najera with a PIN number of 40322334233 through Intermex.

-25-

**Count Thirteen**

Defendant and co-defendant Perez were charged with wiring $1,450 on May 19, 2010, through Intermex. In the call supporting the charge, Defendant and his son, Willy, speak with co-defendant Perez. She named Luis Antonio Alvarado Hernandez as the sender, and she mentioned a transfer through Intermex with a tracking number of 8318216879.

The receipt supporting the charge listed that the sender was Luis Antonio Alvarado Hernandez with a tracking number of 8318216879, through Intermex.

**Count Fourteen**

Defendant and co-defendant Perez were charged with wiring $500 on May 25, 2010, through Western Union. In the call supporting the charge, "Karol" called on Defendant's phone and asked for a name. An individual identified as "Fabian" gave the name of Jesus Adan Manjarez-Molina. The transfer receipt supporting the charge listed the receiver as Jesus Adan Manjarez-Molina.

**Count Fifteen**

Defendant and co-defendant Perez were charged with wiring $900 on May 22, 2010, through Intermex. During the phone call supporting the charge, Defendant spoke with co-defendant Perez and told her how the money was colleted by "Mingo." The transfer receipt supporting the charge indicated that the sender, co-defendant Perez, wired $900 to Rosario Lopez Villalobos.

**Count Sixteen**

Defendant and co-defendant Perez were charged with wiring $485 on May 24, 2010, through Western Union. In one of the calls supporting the charge, Defendant spoke with "UM" and asked "in whose name and where." "UM" responded, "Ingrid Lisbeth Camarillo-Quintanilla in Monterrey."

The transfer receipt supporting that charge indicated that the sender, co-defendant Perez, wired $485 to Ingrid Lisbeth Camarill Quintanilla, in Monterrey through Western Union.

Based on the evidence presented a rational juror could infer that Defendant committed the offense of money laundering in Counts Six through Sixteen.

*B. Recusal of Trial Judge*

Defendant next argues that the trial judge committed plain error by not recusing himself from Defendant's case. More specifically, Defendant contends that the trial judge should have recused himself because he had "previously met with the case agent, reviewed the agent's lengthy affidavit containing background information on the Defendant, and authorized the interception of the Defendant's phone calls." We disagree.

It is a basic tenet of our jurisprudence that "'[t]he right to a fair trial before an impartial tribunal is a fundamental constitutional right.'" *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009) (quoting *State v. Austin*, 87 S.W.3d 447, 470 (Tenn. 2002)). A trial judge should recuse himself or herself whenever the judge has any doubt as to his or her ability to preside impartially or whenever his or her impartiality can reasonably be questioned. *Pannell v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001). This is an objective standard. *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). "Thus, while a trial judge should grant a recusal whenever the judge has any doubts about his or her ability to preside impartially, [citation omitted], recusal is also warranted when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Id*.

The State points out and Defendant concedes that he did not object at any point to the trial court's participation at trial nor did he raise the issue in his motion for new trial. However, this court has held that "[w]hile a party should seek to take whatever action reasonably available to prevent or nullify and error[,]a trial judge must disqualify himself *sua sponte* under certain circumstances." *State v. Smith*, 906 S.W.2d 6, 11 (Tenn. Crim. App. 1995). The trial judge retains discretion over his or her recusal. *Id.* Unless the evidence in the record indicates that the trial judge clearly abused his discretion by not disqualifying himself, this court will not interfere with his decision. *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995).

Although Defendant did not raise this issue in the trial court, he requests that this court review this issue on the basis of plain error. Plain error may be considered by this court "[w]hen necessary to do substantial justice." Tenn. R. App. P. 36(b). However, before such an error is recognized, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). To determine whether plain error exists, five inquiries must be made and answered affirmatively. We must ask: (1) whether the record clearly establishes what occurred in the trial court; (2) whether a clear and unequivocal rule of law has been breached; (3) whether a substantial right of the accused has been adversely affected; (4) whether an accused did not waive the issue for tactical reasons; and (5) whether consideration of the error is necessary to do substantial

justice. *E.g., State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the five-factor test announced in *Adkisson,* 889 S.W.2d at 641–42). Moreover, the error must be especially egregious in that it strikes at "the fairness, integrity or public reputation of judicial proceedings" and is "of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 639, 642.

In this case, Defendant has not shown that a clear and unequivocal rule of law has been breached or that any of the other *Adkisson* factors apply in this case. In *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985), the Sixth Circuit held that a judge who had authorized a wiretap was permitted to preside over a suppression motion in the same action. The court specifically stated:

> Without raising the argument as a specific issue, [Appellants] also complain that the same judge, [ ], who originally authorized the wiretap should not have made the suppression decision. We have overruled this contention in other cases. *See United States v. Murray*, 762 F.2d 1013 (6th Cir. 1985), and *Southerland v. Irons*, 628 F.2d 978 (6th Cir. 1980)(knowledge gained from previous proceedings is not usually grounds for judge's recusal). We sustain, therefore, the action of the district court in respect of the suppression motion.

*Id.* In *Kenneth Crutcher v. United State of America*, No. 3:10-CV-316, 2011 WL 98831, at *8-9 (M.D. Tenn. Jan. 11, 2011), movant contended that trial counsel rendered ineffective assistance of counsel by failing to seek recusal of the presiding judge based on prior approval of a wiretap application. Citing *Lawson*, the United States District Court for the Middle District of Tennessee held that "trial counsel's decision not to seek recusal solely based on the presiding judge's prior authorization of the wiretap did not fall below an objective standard of reasonableness." *Id*. at *9.

Other jurisdictions have held that a trial judge's prior authorization of a wiretap does not require recusal. *See United States v. Nicholson*, 955 F. Supp. 582, 584-85 (E.D. Va., 1997)(Recusal not required when the trial judge previously authorized a wiretap leading to a defendant's arrest); *Camacho v. Autoridad de Telefonos de Puerto Rico,* 868 F.2d 482, 490 (1st Cir.1989)(The "mere fact" that the trial judge had authorized "some (or all) of the underlying intercepts" did not require recusal.); *United States v. Garramone*, 374 F.Supp. 256, 258-59 (E.D.Pa.1974)(The judge refused to recuse himself, ruling that "prior judicial exposure to the parties or questions [is] not sufficient to establish personal bias or prejudice."); *United States v. Foddrell*, 523 F.2d 86, 87 (2d Cir.), *cert. denied,* 423 U.S. 950, 96 S.Ct. 370, 46 L.Ed.2d 286 (1975)(A judge need not recuse himself based on participation in pretrial proceedings related to wire tapping. The Second Circuit ruled proper a trial judge's refusal to recuse himself in a case in which he had "conducted an eleven-day hearing

-28-

on the wire tapping."); and *United States v. de la Fuente,* 548 F.2d 528, 541 (5th Cir.) ("Merely presiding at a pretrial suppression hearing does not disqualify a judge from conducting the trial on the merits."), *cert. denied sub nom. Stewart v. United States,* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249, *and sub nom. Sierra v. United States,* 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977).

Based on the foregoing analysis, the trial court in this case did not commit plain error for failing to recuse itself from Defendant's trial based upon its prior authorization of the wiretap order. Defendant has failed to show that all five of the *Adkisson* factors apply in his case. He had not shown that a clear and unequivocal rule of law has been breached, that a substantial right has been adversely affected, that he did not waive the issue for tactical reasons, or that consideration of the error is necessary to do substantial justice. Defendant is not entitled to relief on this issue.

### C.    *Consecutive Sentencing*

Finally, Defendant argues that the trial court erred "by employing consecutive sentencing to sentence the defendant to a term of fifty-six years to serve in the Department of Correction[]." We disagree.

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Under Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one offense, the trial court shall order the sentences to run either consecutively or concurrently. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

T.C.A. § 40-35-115(b). When imposing a consecutive sentence, a trial court should also consider general sentencing principles, which include whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *See State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The imposition of consecutive sentencing is in the discretion of the trial court. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). The presence of a single factor is enough to justify the imposition of consecutive sentences. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995).

The trial court considered the factors enumerated in Tennessee Code Annotated section 40-35-115(b) and concluded that a portion of Defendant's sentence should run consecutively because Defendant had an extensive record of criminal activity, and he was professional criminal. T.C.A. § 40-35-115(b)(1), (2). Concerning Defendant's sentence, the trial court stated:

It is apparent from the record that this man was convicted previously, he was deported, and he's back in this country illegally. There is no question whatsoever in this court's mind that he continues to deal, he continues to bring drugs in this community, and that he doesn't care one thing about what happens to the victims of those drugs as long as he can carry out his conspiracy and work with some drug organization in Mexico.

As a trial judge in this court I think it is my absolute duty to do what I can to try to prevent this. There is no question that several [enhancement] factors apply in this case because he does have a previous history, he was the leader of the offense in these matters, and it did involve a number of offenses.

\*　　\*　　\*

-30-

Now the Court has got to look at the situation of multiple convictions in this case. There is no question in this court's mind that this gentleman is a professional criminal with what he has been doing and what he did. He has a record of previous criminal activity, so there is no question in this court's mind that he does fall under Section 40-35-115 of the code under multiple convictions.

The record supports the trial court's decision to order partial consecutive sentencing in Defendant's case. We note, as pointed out by the State, that "[p]rior criminal activity does not require prior convictions; prior criminal behavior is sufficient." *State v. William Lewis Houston*, No. M1999-01430-CCA-CD, 2000 WL 1793088, at *12 (Tenn. Crim. App., Dec. 7, 2000) *perm. app. denied* (Tenn. May 7, 2001). Special Agent Dennis Mabry testified at the sentencing hearing that Defendant was the "money man" for the drug trafficking organization and that he was in charge of collecting the money and distributing it back to Mexico. He said that Defendant had direct contact with the suppliers in Mexico. Special Agent Mabry testified that Defendant was part of an investigation from March 1, 2010, until July of 2010. He said that in the month of May alone, Defendant wired "a couple hundred thousand dollars" back to Mexico. Concerning the time frame of the conspiracy as charged in the indictment, "which began during the first part of September of 2009," he was able to track payments that Defendant sent back to Mexico for the drug organization. He said:

They were wire transfer payments. There were a couple hundred thousand dollars, $200,000 approximately, just in the month of May. We know that prior to that, though, the tractor trailers were coming to Nashville.

According to the CS, he picked up $200,000 in the month of February; then in the month of March he picked up $200,000 under our direction, which went back to Mexico; and another $60,000 on March the 12th that we determined, through the court authorized intercepts, while under surveillance.

Special Agent Mabry testified that during the investigation, he was unable to determine that Defendant was employed. He testified that Defendant had a "huge involvement" in horse racing and would place bets. He said that Defendant did not acquire money from any "legitimate" gambling activities. It was Special Agent Mabry's opinion that a substantial portion of Defendant's income was derived from the illegal sale of narcotics.

The presentence report reflects that in addition to the present offenses, Defendant pled guilty on February 28, 2008, to "Schedule VI drugs: 10 lbs -70lbs," a weapons offense, and "Schedule VI drugs; Not less than ½ oz." The comments to Defendant's record state the following:

The defendant's arrest records show one prior criminal case in Davidson County, Tennessee. On 02/28/08, Mr. Flores pled guilty to Counts One, Three, and Four in Case Number 2007-C-2421 in Division III Criminal Court. Counts Two and Five were dismissed as a part of the plea agreement. He was sentenced to two (2) years as a Range I standard offender in each count, which were run concurrent with one another. On 04/07/08, he was granted determinate release. However, he had an active ICE detainer and was detained at that time before being able to report to probation. Probation Officer Whitney Weissberg, who was assigned to the defendant recorded that the defendant was deported shortly after being granted determinate release and never reported to probation. The sentence expired on 06/24/09.

Recently, addressing the standard of appellate review as to the length of a sentence, our supreme court held in *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012),

> In our view, [ *State v.*] *Carter* [, 254 S.W.3d 335 (Tenn. 2008) ] marked the beginning of this Court's recognition that sentences should be reviewed under an abuse of discretion standard. . . . We hold, therefore, . . . the 2005 amendments [to the Sentencing Act of 1989] also effectively abrogated the de novo standard of appellate review. . . . We adopt an abuse of discretion standard of review, granting presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act.

*Bise*, 380 S.W.3d at 707.

Subsequently, our supreme court adopted the same standard of review for a trial court's decision regarding the manner of service of a sentence in the context of whether probation or some other form of alternative sentence was appropriate. *State v. Caudle*, 388 S .W.3d 273, 278-79 (Tenn. 2012). In *Caudle*, the supreme court recognized,

> As stated in *Bise*, "when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the 'presumption of correctness' ceased to be relevant. 380 S.W.3d at 708.

*Caudle*, 388 S.W.3d at 279.

Our review of the record confirms the factual findings of the trial court as to the basis to order consecutive sentencing. We conclude that while the holdings in *Bise* and *Caudle*

should also apply to decisions of whether to impose consecutive or concurrent sentencing, the appropriate standard remains disputed among panels of this court. However, even if review of whether the facts found to justify a ground for consecutive sentencing is reviewed de novo with a presumption of correctness, then under either standard, the trial court's decision to impose consecutive sentencing should be affirmed. The trial court properly ordered Defendant's sentences in Counts One, Two, Five, and Six to be served consecutively with each other and the remaining counts to be served concurrently with Count Six, for an effective fifty-six-year sentence. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE