# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 24, 2009 at Knoxville

## STATE OF TENNESSEE v. BRUCE ELLIOT

**Appeal from the Criminal Court for Davidson County**
**Nos. 2007-B-1546, 2007-B-1547     Steve Dozier, Judge**

_____

**No. M2008-02686-CCA-R3-CD - Filed April 9, 2010**

_____

A Davidson County Criminal Court jury convicted the defendant, Bruce Elliot, of conspiracy to possess 300 grams or more of cocaine, *see* T.C.A. § 39-17-417(j)(5) (2006); possession of 300 grams or more of cocaine, *see id.* § 39-17-417(j)(5); possession of a firearm by a convicted felon, *see id.* § 39-17-1307(b)(1)(a); possession of one-half ounce or more of marijuana, *see id.* § 39-17-417(g)(1); conspiracy to deliver 300 grams or more of cocaine within 1,000 feet of a school, *see id.* § 39-17-417(j)(5), -432; and money laundering, *see id.* § 39-14-903. The trial court imposed an effective sentence of 66 years' incarceration. In this appeal, the defendant challenges the sufficiency of the evidence, argues that the trial court should not have permitted a State's witness to testify regarding "drug jargon," contends that the trial court erred by denying his motion to suppress evidence seized during a search of the defendant's apartment, and claims various errors in his sentencing. Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Bruce Elliot.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In late 2006, Sergeant James McWright of the 20th Judicial District Drug Task

Force began an investigation into the illegal distribution of cocaine that was originally centered on an individual named Angela Fleming. During his investigation, Sergeant McWright learned that Ms. Fleming, who had been distributing cocaine in small quantities, obtained the drugs she sold from Autumn Gentry and David Wade. Following the execution of a search warrant at an apartment "off of Highway 70," Sergeant McWright obtained a warrant to wiretap telephones being used by David Wade and Angela Fleming. From wire-tapped conversations on these two telephones, he discovered that David Wade's drug supplier was his brother, Sean Wade. Sergeant McWright obtained a warrant to wiretap Sean Wade's telephone and learned during the recorded conversations that Sean Wade bought drugs from an individual named Anthony Woods. After securing a wiretap warrant for the telephone being used by Anthony Woods, Sergeant McWright determined that the defendant supplied cocaine and marijuana to Mr. Woods. Later, Sergeant McWright determined, via wiretapped conversations on the telephone being used by the defendant, that the defendant bought large quantities of cocaine and marijuana from a man later identified as Mariano Diaz. The defendant then distributed the drugs to Mr. Woods and other individuals in smaller quantities.

Sergeant McWright testified that during telephone conversations between the defendant and Mr. Diaz on January 25 and 26, 2007, Mr. Diaz arranged to deliver three kilograms of cocaine to the defendant. According to the recorded conversations, Mr. Diaz expected to receive delivery of 17 kilograms of cocaine from his supplier, who was bringing the cocaine from Dallas, Texas. Based upon these conversations, Sergeant McWright ordered that the defendant's residence and Mr. Diaz's residence be placed under surveillance. He recalled that as he and other officers watched the residences on January 26, 2007, he received information from "the wire room" that "the Mexican . . . was talking to [the defendant] and was leaving shortly headed to the house with the drugs."[1] Shortly after this warning, Sergeant McWright saw a vehicle being driven by an Hispanic male leave the Diaz residence at 4609 Rockland Trail carrying an Hispanic female passenger. Sergeant McWright and other members of the drug task force followed the vehicle as it passed Mount View Elementary School en route to the defendant's residence at 6565 Premier Drive, Apartment K-3.[2]

---

[1]Sergeant McWright described "the wire room" as the location where independent, civilian monitors monitored wire-tapped telephone conversations via computer. He stated that the monitors listen only to those conversations related to illegal activity. He also explained that although the monitors were continuously supervised by either a drug task force agent or assistant district attorney general, only the monitors had access to the wire room.

[2]Evidence established that although apartment K-3 was leased in the name of Stacy Walling, the defendant resided at the apartment with Ms. Walling.

Drug task force officer Ernest Edward Rigsby followed the vehicle from the Diaz residence as it traveled along Murfreesboro Road toward Nashville. He recalled that they passed Mount View Elementary School, which was visible from the road. Other evidence established that Mr. Diaz's vehicle passed within 1,000 feet of the school as it traveled on Murfreesboro Road. Officer Rigsby testified that the vehicle arrived at the defendant's residence at 7:52 p.m., and the two occupants went inside the defendant's residence. A short time later, Metro police officer Herbert Kajahara, who had been observing the defendant's residence, saw two Hispanic individuals, one male and one female, leave the defendant's apartment with the female carrying a large black bag. According to Officer Rigsby, the two Hispanics drove away from the defendant's residence at 8:26 p.m. Officer Rigsby followed the vehicle and initiated a traffic stop a short time later. He testified, "Upon placing the individuals under arrest, we found four pounds of marijuana in the right rear of the vehicle. I found fifty-four thousand dollars cash in the right front in a black bag on the floorboard." The Hispanic male was identified as Mariano Diaz and his female passenger was identified as Alba Torres.

Sergeant McWright confirmed that he ordered Officer Rigsby to initiate a traffic stop of the Diaz vehicle. Shortly after Diaz left the defendant's apartment, Sergeant McWright saw the defendant's girlfriend, Stacy Walling, and a man named David Kirby exit the defendant's residence and get into a white Pontiac. Sergeant McWright noticed that Ms. Walling "was carrying a fairly large bag" and decided to conduct a traffic stop of her vehicle to ensure that no cocaine left the premises. He stated that he learned from Ms. Walling that she was leaving to go purchase food for the defendant. Sergeant McWright testified that Ms. Walling's large black bag "turned out to be a pocketbook" and that she had no contraband in her possession.

Sergeant McWright testified that after learning that the defendant, who was alone in the apartment, expected Ms. Walling to return shortly and that the defendant expected one of his distributors to arrive at any time, he made the decision to "secure the apartment." He explained that Detective Aaron Thomas, who had been working in the wire room on that evening, was working to procure a search warrant for the defendant's residence but that it would be "hours" before the warrant was completed. He stated that he was concerned that the defendant would destroy the drugs if he suspected that the police were nearby. He explained that on a previous occasion, the defendant and Mr. Woods disposed of a large amount of cocaine after being informed of surveillance by the drug task force. Sergeant McWright ordered other officers to enter the defendant's apartment and then "cleared" the parking lot so that the police presence would not be apparent.

Metro police officer Kevin Guyton, who secured the defendant's apartment at Sergeant McWright's request, testified that he knocked on the door to the apartment, and

when no one answered, he and the other officers "had to make forced entry into the apartment." Once inside the apartment, Officer Guyton saw "two kilos of cocaine sitting on the counter in plain view in the kitchen," "marijuana in plain view" in a bedroom, and, in a bathroom, "a large duffle bag" containing "several clear plastic bags of marijuana" in the sink. Officer Guyton observed "another kilo of cocaine that had already been totally cut open" on top of the duffle bag full of marijuana. Officer Guyton recalled that after placing the defendant under arrest, he and other officers "cleared the couch to make sure that there was no other threat, such as weapons, because [the defendant] was going to be sitting there" while the officers awaited the search warrant. He stated that "there was a .22 caliber pistol in the cushion of the couch. Under the couch was . . . a lock box, for . . . a .44 caliber Desert Eagle handgun." After the other officers secured the apartment, Sergeant McWright returned to the apartment with Ms. Walling and Mr. Kirby, and they all waited inside the apartment for the search warrant.

Detective Aaron Thomas testified that it was his primary duty "to review all the calls that w[ere] coming in and d[o] whatever necessary follow up that needed to be done on it." During Detective Thomas's testimony, many of the calls he monitored were played for the jury. These calls established that the defendant was receiving large quantities of cocaine and marijuana from Mr. Diaz and then distributing the marijuana primarily to Anthony Woods. The calls also established that the defendant owed Mr. Diaz for marijuana that Mr. Diaz had "fronted" to the defendant. Detective Thomas recalled that the defendant indicated a dissatisfaction with Mr. Diaz's previous delivery of cocaine because of its odd aroma and because it was not conducive to being "cooked" into crack cocaine. Most importantly, the calls established that Mr. Diaz had received a large shipment of cocaine and marijuana and that he intended to provide three kilograms of cocaine to the defendant on January 26, 2007. Detective Thomas confirmed that the defendant and Mr. Diaz spoke about their exchange of drugs in "jargon" or "slang."

Detective Thomas testified that he obtained a warrant to search the defendant's apartment based upon the information gleaned from the wire-tapped conversations, the surveillance, and the presence of contraband viewed by officers securing the defendant's apartment. During the search of the defendant's apartment, officers recovered large amounts of both cocaine and marijuana from the kitchen, living room, bedroom, and bathroom; a loaded .22 caliber pistol; a lockbox containing a .44 caliber Desert Eagle handgun; a "kilo press"; and digital scales. Detective Thomas and Officer Guyton explained that drug dealers used the kilo press to reform cocaine into kilogram-sized bricks after mixing the pure cocaine with various "cutting agents." Digital scales were used to package the cocaine and marijuana into smaller quantities for distribution. Detective Thomas stated that although no identifiable fingerprints were found on either gun recovered from the defendant's apartment, the defendant told the searching officers where to find the key to the lock box that contained the

Desert Eagle handgun.

Tennessee Bureau of Investigation drug chemist Patty Choatie testified that the white powder material recovered from the defendant's apartment was 3,109.9 grams of cocaine and that the plant material recovered from the apartment was 2,234.6 grams of marijuana.

The defendant chose to present no proof, and, based upon the evidence presented above, the jury convicted the defendant of conspiracy to possess 300 grams or more of cocaine, possession of 300 grams or more of cocaine, unlawful possession of a weapon by a convicted felon, possession of more than one half ounce but less than 10 pounds of marijuana, conspiracy to deliver 300 grams or more of cocaine, and money laundering.

*I. Sufficiency of the Evidence*

The defendant contends that the evidence presented at trial was insufficient to support his convictions in this case. We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"It is an offense for a defendant to knowingly . . . [d]eliver a controlled substance; . . . or . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(2), (4) (2006). The term "possession" embraces both actual and constructive possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). In order for a person to "constructively possess" a drug, that person must have "'the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others.'" *Id.* (quoting *State v. Williams*, 623

S.W.2d 121, 125 (Tenn. Crim. App. 1981)). Additionally, "it may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419.

Code section 39-12-103 provides:

(a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

(b) If a person guilty of conspiracy, as defined in subsection (a), knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense, the person is guilty of conspiring with the other person or persons, whether or not their identity is known, to commit the offense.

(c) If a person conspires to commit a number of offenses, the person is guilty of only one (1) conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship.

(d) No person may be convicted of conspiracy to commit an offense[] unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

*Id.* § 39-12-103(a)-(d). To prove the existence of a conspiratorial relationship, the State may rely upon a "mutual implied understanding" existing between or among the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). The conspiracy need not be proved by production of an official or formal agreement, in writing or otherwise. *Id.* The conspiracy may be demonstrated by circumstantial evidence and the deportment of the participants while undertaking illegal activity. *Id.* Conspiracy connotes harmonization of design, not coequal participation in the minutia of every criminal offense. *Id.*

"It is an offense to knowingly use proceeds derived directly or indirectly from

a specified unlawful activity with the intent to promote, in whole or in part, the carrying on of a specified unlawful activity." T.C.A. § 39-14-903(b)(1) (2006). For purposes of the statute prohibiting money laundering, the phrase

> "[k]nowingly uses or attempts to use proceeds derived directly or indirectly from a specified unlawful activity" means that any person or party to the transaction or act knew that the property or proceeds involved in the transaction or act represented or constituted, either in whole or in part, proceeds from some form, though not necessarily which form, of any criminal offense under the laws of this state, or any other jurisdiction.

*Id.* § 39-14-902(3). The Code defines "specified unlawful activity" as "any act, including any preparatory or completed offense, committed for financial gain that is punishable as a felony under the laws of this state." *Id.* § 39-14-902(5)(A).

The evidence adduced at trial established that the defendant and Mr. Diaz agreed that Mr. Diaz would deliver to the defendant three kilograms of cocaine and a large quantity of marijuana. The proof also established that Mr. Diaz had previously "fronted" an amount of marijuana to the defendant for which Mr. Diaz was still owed payment. Their discussion of the quality of previously delivered cocaine evinces an ongoing relationship. Further, wire-tapped conversations established that the defendant supplied cocaine and marijuana to Ms. Walling, his live-in girlfriend, who in turn supplied illegal drugs to others for distribution. Officers observed Mr. Diaz and Ms. Torres drive from Mr. Diaz's residence, past Mount View Elementary School, and to the defendant's residence. Upon exiting the defendant's residence, Ms. Torres was carrying a large black bag in which authorities later found $54,000 in cash. Officers also discovered a large quantity of marijuana in the vehicle with Mr. Diaz and Ms. Torres. After Mr. Diaz and Ms. Torres left the defendant's residence, the defendant advised one of his suppliers that he had received the cocaine from Mr. Diaz and invited the supplier to come to the defendant's apartment to pick it up. When officers entered the defendant's apartment, they found the defendant alone inside the apartment with 3,109.9 grams of cocaine and 2,234.6 grams of marijuana, a press used to form cocaine into kilogram-sized bricks, digital scales, and two handguns. The defendant told officers where to find the key to a lock box containing one of the handguns.

This evidence clearly established that the defendant conspired with Diaz for the delivery of more than 300 grams of cocaine and that he conspired with Ms. Walling to possess more than 300 grams of cocaine with intent to deliver. *See Shropshire*, 874 S.W.2d at 641. Although the defendant argues that the State failed to establish that he, rather than Ms. Walling or Mr. Kirby, possessed the drugs and weapons, the defendant's presence alone

in the apartment at the time officers entered and his knowledge of the key to the lock box established his ability to reduce the marijuana, cocaine, and handguns to his actual possession at any moment.[3] *See Cooper*, 736 S.W.2d at 129. Moreover, the jury was free to infer from the large amount of illegal drugs involved that the defendant possessed them with the intent to deliver them. *See* T.C.A. § 39-17-419. Finally, the State presented sufficient evidence from which the jury could infer that the defendant gave the $54,000 to Mr. Diaz and Ms. Torres as payment for drugs and that he earned the money from selling drugs. In consequence, the defendant is not entitled to relief on this issue.

## II. *Testimony of Detective Thomas*

The defendant asserts that the trial court erred by permitting Detective Thomas to testify about the meaning of certain terms used by participants in the wire-tapped conversations because the State failed to present sufficient proof of the detective's knowledge of drug jargon. The State contends that the trial court properly admitted the testimony based upon Detective Thomas's experience in the investigation of the illegal drug trade and his knowledge of the terminology used by drug dealers.

First, we note that the admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Its counterpart, Rule 703, focuses on the reliability of expert opinion testimony. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993).

When the State establishes that an officer possesses the necessary training, experience, and familiarity with the illicit drug trade, the officer may testify about matters relating to the business of buying, selling, trading, and use of illegal drugs pursuant to Rule 702 of the Tennessee Rules of Evidence. *See State v. Gayle Thomas Crawford*, No. W2009-00263-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, Oct. 7, 2009); *see also, e.g.*, *State v. Daniel Potin*, W2005-01100-CCA-R3-CD, slip op. at 5-6 (Tenn. Crim. App., Jackson, June 7, 2006), *perm. app. denied* (Tenn. Nov. 13, 2006); *State v. Samuel*

---

[3]The defendant conceded that he was a convicted felon, thus requiring that the jury only needed to determine whether he possessed the handguns.

*L. Giddens*, No. M2002-00163-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App., Nashville, Nov. 15, 2004); *State v. Timothy Murrell*, No. W2001-02279-CCA-R3-CD, slip op. at 7-9 (Tenn. Crim. App., Jackson, July 2, 2003).

In this case, Detective Thomas testified that the primary focus of his law enforcement career had been the investigation of large-scale drug conspiracies. He stated that he had listened to numerous wire-tapped conversations, interviewed numerous suspects, and participated in innumerable drug-trade investigations. He stated that his training and experience had afforded him specialized knowledge in the jargon or slang used by drug dealers and users in the exchange of illegal drugs. He noted that participants in the drug trade communicate exclusively in slang to avoid detection of their illegal activity. Under these circumstances, we cannot say that the trial court erred by permitting Detective Thomas to testify as an expert in drug jargon.

### III. Motion to Suppress

The defendant contends that the trial court erred by denying his motion to suppress the guns, cocaine, and marijuana seized from his apartment. He argues that the warrantless entry of the apartment violated his constitutional rights and that, because evidence observed during the warrantless entry was included in the search warrant, the warrantless entry rendered invalid the search warrant later obtained by police. The State submits that exigent circumstances existed necessitating the initial, warrantless entry into the defendant's apartment and that probable cause supported the issuance of the search warrant.

As the State correctly points out, the record does not contain a copy of the search warrant in this case. The appellate record must "convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal," Tenn. R. App. P. 24(a); *see State v. Housler*, 167 S.W.3d 294, 296 (Tenn. 2005), in order to provide "the boundaries of an appellate court's review," *State v. Smotherman*, 201 S.W.3d 657, 660 (Tenn. 2006) (citing *State v. Bobadilla*, 181 S.W.3d 641, 643 (Tenn. 2005)). "An appellate court may consider only evidence contained in the appellate record." *Id.* It is the duty of the appellant to prepare an adequate record for appellate review. *See* Tenn. R. App. P. 24; *see also State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). Because the search warrant does not appear in the record on appeal, we cannot fairly determine whether the warrant was supported by probable cause, either with or without evidence obtained following the warrantless entry into the defendant's apartment. Accordingly, in this case the failure to include the search warrant in the record on appeal precludes our review of the denial of the motion to suppress.

*IV. Sentencing*

Finally, the defendant challenges his sentence, arguing that the trial court erred by applying certain enhancement factors and by imposing consecutive sentences. The State submits that the sentence is appropriate. We agree with the State.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of

potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

At the sentencing hearing, Detective Thomas testified that the defendant had not worked since April of 2006 and that his sole source of income was proceeds from the sale of illegal drugs. Additionally, Detective Thomas testified that the defendant was the leader of a large drug conspiracy in which he supplied drugs to Anthony Woods, Stacy Walling, Sean Wade, David Wade, and Angela Fleming.

The defendant elected not to take the stand to testify on his own behalf but offered a statement expressing his remorse. He noted that he was upset that his conduct had resulted in his separation from his children and their separation from each other.

Citing the defendant's record of criminal convictions, which included convictions for voluntary manslaughter and a number of misdemeanors, *see* T.C.A. § 40-35-114(1); his leadership role in the offenses, *see id.* § 40-35-114(2); his failure to comply with previous sentences involving release into the community, *see id.* § 40-35-114(8); and his possession of a weapon during the commission of the drug offenses, *see id.* § 40-35-114(9), the trial court enhanced each of the defendant's sentences beyond the minimum within Range I and imposed the following sentences:

| Offense | Sentence |
|---|---|
| Conspiracy to possess 300 grams or more of cocaine | 20 years |
| Possession with intent to deliver 300 grams or more of cocaine | 20 years |
| Unlawful possession of a weapon | 2 years |
| Possession of more than .5 ounces but less than 10 pounds of marijuana | 2 years |
| Conspiracy to deliver 300 grams or more of cocaine within 1,000 feet of a school | 24 years |
| Money laundering | 10 years |

The trial court also concluded that the defendant made "a living off of drug dealing" and that he had an extensive criminal history. *See id.* § 40-35-115(1)-(2). Based upon these findings, the trial court ordered that the sentences for conspiracy to possess 300

grams or more of cocaine, possession with intent to distribute 300 grams or more of cocaine, unlawful possession of a weapon, and conspiracy to deliver 300 grams or more of cocaine within 1,000 feet of a school be served consecutively. The effective sentence is, therefore, 66 years. The court specifically concluded that the lengthy sentence was necessary to avoid depreciating the seriousness of the offenses in this case and to operate as a deterrent to others similarly inclined to commit drug offenses.

The defendant claims that the trial court erred by finding that the defendant was a leader in the commission of the offenses because Mr. Diaz actually led the drug conspiracy. The record, however, establishes that the defendant presided over a small cadre of drug distributors to whom he supplied cocaine and marijuana.

The defendant also claims that the trial court erred by enhancing his sentences based upon its finding that he used or possessed a firearm during the commission of the offenses because "he did not lease the apartment and . . . the State failed to prove that the [defendant] possessed the weapons in this case." As we have previously concluded, the State presented ample evidence that the defendant possessed each of the weapons inside the apartment. As a result, the trial court did not err by using this factor to enhance the defendant's sentences for the drug offenses. To the extent that the trial court used this factor to enhance the defendant's sentence for unlawful possession of a weapon, the trial court would be in error. *See* T.C.A. § 40-35-114 (prohibiting use of enhancement factors where the factor is "already an essential element of the offense"). The record establishes, however, that the defendant's record of criminal convictions was sufficient to support the two-year sentence imposed for that conviction.

Lastly, the defendant contends that the trial court erred by ordering consecutive sentences on the basis of its finding that the defendant was "a 'dangerous offender.'" The record belies the defendant's claim that the trial court abused its discretion by declaring him a dangerous offender because the trial court specifically ruled that the defendant was not a dangerous offender. Instead the trial court based the imposition of consecutive sentences on its findings that the defendant's "major source of livelihood" was his participation in the illegal drug trade and that the defendant had an extensive record of criminal activity. The record supports each of these findings.

*V. Conclusion*

The evidence adduced at trial was sufficient to support each of the defendant's convictions in this case and the trial court did not err by refusing to suppress the evidence discovered during the search of the defendant's apartment. Furthermore, the trial court did not err by permitting Detective Thomas to testify as an expert witness in the terminology

utilized in the illegal drug trade. Finally, the defendant's sentence was not excessive. Accordingly, the judgments of the trial court are affirmed.

_____

JAMES CURWOOD WITT, JR., JUDGE