# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Jackson March 3, 2015

## STATE OF TENNESSEE v. ALFRED CALVIN WHITEHEAD

**Appeal from the Criminal Court for Davidson County**
**No. 2011-C-2526    Monte D. Watkins, Judge**

---

**No. M2014-00748-CCA-R3-CD - Filed July 9, 2015**

---

The Defendant, Alfred Calvin Whitehead, was convicted by a Davidson County Criminal Court jury of possession of 0.5 gram or more of cocaine with the intent to deliver in a Drug-Free School Zone, a Class A felony. *See* T.C.A. §§ 39-17-417(a)(4) (2010) (amended 2012, 2014) (possession of cocaine with intent to sell), 39-17-417(c)(1) (classifying the offense as a Class B felony), 39-17-432(b)(1) (2014) (requiring that offenses committed in a Drug Free School Zone be sentenced one classification higher and affecting the minimum required service and release eligibility of the sentence). The Defendant, a Range II offender, was sentenced to serve twenty-eight years with a minimum required service of twenty-five years. On appeal, the Defendant contends that (1) the evidence is insufficient to support the conviction, (2) the trial court erred in failing to grant a mistrial because a juror slept during a portion of the proof, (3) the trial court erred in permitting a police officer to testify as an expert witness, and (4) the sentence imposed constitutes cruel and unusual punishment. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Jason Chaffin (on appeal and at motion for new trial) and Samuel A. Wooden (at trial), Nashville, Tennessee, for the appellant, Alfred Calvin Whitehead.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Antoinette Welch and John Zimmerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

At the trial, Metro Nashville Police Officer Eric Knight testified that on May 19, 2011, he was involved in a "buy-bust" operation involving an undercover purchase of drugs from and the arrest of a street-level drug dealer. He identified the Defendant and said the Defendant was arrested in the J.C. Napier housing area. Using a map, he identified the area and the point of the arrest, which he said was across the street and "five hundred some odd" feet from Cameron Middle School.

Regarding the events leading to the arrest, Officer Knight testified that he saw a black male approach the Defendant. The Defendant wore a white tank top and blue shorts. He said the two men "walked back" to a shadowy area between some buildings, engage in what appeared to be a hand-to-hand transaction, and walked in the direction from which they had come. Officer Knight and Detective Jeremy Smith went to the Defendant's location within about one minute and arrested him. He said he recovered $777 from the Defendant's left pocket and a bag containing 4.3 grams of a substance that field tested positive for the presence of cocaine.

Officer Knight testified that typically, hand-to-hand transactions were quick in order to avoid detection. He said the individuals involved would walk away from a crowd and exchange money and drugs. He said that normally, the drug dealer and buyer would want to get away from each other quickly. He said a crack cocaine buyer would want to smoke the drug as quickly as possible.

Officer Knight identified the bag containing a white rock substance he recovered from the Defendant. He said the bag contained "twenty rocks," each of which typically would weigh about 0.2 gram and be sold for $20. Based upon the total weight of 4.3 grams, he estimated the bag contained twenty-one rocks. He said that most crack cocaine users bought a $10 rock weighing 0.1 gram or a $20 rock weighing 0.2 gram. He said that when he arrested a crack cocaine user, the person typically had burn marks on the person's fingers from using a hot pipe to smoke the drugs, "Chore Boy" copper tubing to filter the pipe, and a metal pipe.

Officer Knight testified that he completed the paperwork relative to the Defendant's arrest. He said the Defendant gave a Nashville home address that was not near the arrest scene and stated he was unemployed.

On cross-examination, Officer Knight testified that the events occurred around 8:30 p.m. on May 19, 2011. He said that he recognized the Defendant because he knew him

previously but that he did not know the other person involved in the transaction. He said that he was 50' to 100' from the individuals involved in the transaction, that he did not wear night vision goggles, and that he was inside a car with tinted windows. He acknowledged that he did not see drugs or money change hands. He acknowledged he did not see the unidentified man smoke crack cocaine or hold drug paraphernalia. He acknowledged he did not see whether a crowd was around the Defendant before the Defendant walked away for the transaction but said others were in the area when the Defendant returned to the area where he had been previously.

Officer Knight testified that in his experience, drug dealers kept their crack cocaine rocks in a single bag, rather than having each rock in an individual bag. He said that in contrast, quantities of marijuana possessed for resale were often packaged in individual bags. He said that in his experience, street-level drug dealers did not keep written records. He said drug dealers he had arrested had nicknames or "street names" but did not use false names instead of their given names. He said drug dealers knew possession of weapons with drugs increased the penalties. He said that they sometimes had other people who held their guns or that they kept their guns in bushes. He agreed that drug dealers sometimes used lookouts but did not know if the Defendant employed a lookout that night. He agreed the Defendant did not possess a gun, scales, or records related to drug transactions.

On redirect examination, Officer Knight testified that a typical hand-to-hand transaction occurred quickly, had no obvious movement, and occurred at waist level. He said a drug dealer typically gave the buyer a rock without the buyer selecting the rock he wanted. He said the Defendant did not possess drug paraphernalia and did not make any statements about being a drug user. On recross-examination, he disagreed that the hand-to-hand transaction he saw resembled a handshake.

Metro Nashville Police Officer Robert Young testified that he was involved in the buy-bust operation on May 19, 2011. He said that in an operation of this nature, a geographic area was targeted based upon complaints and crime activity. He said an officer photocopied the money used in order to record the serial numbers. He said $20 transactions were typical. He said that after a suspect was apprehended, the serial numbers of cash the suspect possessed was compared with the serial numbers of the money designated for the operation.

Regarding the events of May 19, Officer Young testified that he was a member of the surveillance and takedown team. He identified the Defendant as a person with whom he came into contact. While he was parked in an undercover vehicle, he saw the Defendant, who matched a physical description he had received via radio. He said the Defendant wore bright blue shorts and a white tank top. He said that the Defendant had been described as having met with another person but that he did not see a second person near the Defendant.

-3-

He said the Defendant was walking through a "cut" that led from a road behind homes in the J.C. Napier housing development toward Charles E. Davis Boulevard.

Officer Young testified that after he received the takedown signal, he, Detective Knight, and Detective Smith apprehended the Defendant. He said that the Defendant had $777 in small denomination bills in his left pocket and that a bag containing a white rock substance, which tested positive for the presence of cocaine base, fell to the ground when Officer Knight searched the Defendant's right pocket. He said the Defendant's cash included a $20 bill with a serial number matching one of the $20 bills the police had photocopied for the operation. He identified the evidence collected relative to the case, which included a bag containing a white, rock-like substance weighing 0.2 gram that field tested positive for cocaine base and a bag with a white, rock-like substance weighing a total of 4.3 grams that field tested positive for cocaine base.

Officer Young testified that drug dealers typically had cash in multiple, small denominations. He said that although the police department did not conduct controlled buys for less than $20, a user might make a smaller purchase. He said that drug dealers in the area in which the transaction took place "may . . . claim a corner" or specific area from which to sell drugs. In his experience, he had not encountered a drug user who possessed over $700 cash or over four grams of crack cocaine.

On cross-examination, Officer Young testified that although drug dealers sometimes carried guns, the Defendant did not have one when he was arrested. He agreed that the items seized at the scene included a bag containing a 0.2 gram white rock. He agreed that the Defendant was arrested in a housing project and that the people in the area generally were poor. On redirect examination, he acknowledged the 0.2 gram rock was not seized from the Defendant's person.

Metro Nashville Police Department Lieutenant William Mackall testified that he was in charge of the Narcotics Unit of the Twentieth Judicial District Drug Task Force. His twenty-two years of law enforcement experience included posing as a drug buyer, posing as a drug dealer, conducting long-term investigations, conducting street-level interdiction, attending numerous educational seminars, training other officers, and addressing citizens' and patrol officers' complaints. He estimated he had been involved as an officer or supervisor in over 1000 buy-bust operations. He said he had testified as an expert witness in over one dozen drug-related trials. The trial court permitted Lieutenant Mackall to testify as an expert witness in street-level drug sales.

Lieutenant Mackall testified that buy-bust operations involved a purchase by an undercover police officer or a private citizen acting as a confidential informant. He said that

when a confidential informant was used, the person was searched before and after the drug deal and was given instructions about where to go, what to do, and what not to do. He said that if the informant had money, it would be taken before the deal, and the person would be supplied with police money that had been photocopied.

Lieutenant Mackall testified that crack cocaine was derived from cooking powder cocaine to remove impurities and resulted in a rock form which was broken into smaller pieces for street sales.

Lieutenant Mackall testified that street-level drug dealers usually had crack cocaine broken into small rocks for individual sales before they sold the drugs. He said some dealers possessed scales when they sold drugs.

Lieutenant Mackall testified that although he did not have medical training, his understanding from interviewing people he had arrested was that crack cocaine was more addictive than powder cocaine. He said that in his experience with buy-bust operations and in working as an undercover officer posing as a street-level drug dealer, most drug buyers requested a "twenty," which weighed 0.2 gram and was smaller than an eraser head. He said an "eight ball" referred to 3.5 grams or one-eighth of an ounce. He said that the quantity was often requested by the price for that quantity and that people in the geographic area where a transaction took place knew the quantity based upon the price. He said 3.5 grams would cost $150 to $300, depending on its current availability.

Lieutenant Mackall testified that the majority of drug users he encountered possessed a smoking utensil, generally referred to as a crack pipe. Using a crack pipe to demonstrate, he explained its use to the jury. He said that a user would smoke 0.2 gram or less at a time and that the effect was not increased if a larger amount was used. He said a drug user needed four things to smoke crack cocaine: the drug, a pipe, a filter, and a lighter. He said a push rod was used to clean the pipe after it had been used. He said that crack cocaine might also be used by crumbling it and putting it in a cigar or in the tip of a cigarette. He said it could be dissolved in water and injected with a syringe, although this method was rarely used for crack cocaine.

Lieutenant Mackall testified that drug users typically had no more than small amounts of money or "loose change." He agreed that after a crack cocaine user bought drugs, the user typically went to another location to smoke the drugs as quickly as possible. He said some individuals became addicted the first time they used crack cocaine. He said he had never encountered a drug user who was in possession of four grams of crack cocaine and over $700 or who bought a bulk amount of crack cocaine to use over time.

Lieutenant Mackall testified that in his experience, drug dealers sometimes worked in pairs or alone. He said dealers sometimes possessed drugs but other times had the drugs in a hidden location from which they would retrieve them and return to the location of a sale. He said dealers often had a "mole," which referred to a drug user who took risks for a dealer by transporting the drugs for a sale. He said some dealers had their drugs packaged individually and others did not. He said he had seen drugs packaged in color-coded bags based upon weight. He said some dealers carried rocks of crack cocaine loose in their hands in order to be able to discard them easily if the police became involved. He said that if a drug dealer did not have scales in his possession, he would have scales in a nearby house or car. He said drug dealers usually had cash in small denominations because they engaged in multiple transactions and needed to be able to make change.

Lieutenant Mackall testified that although drug dealers sometimes conducted business near their homes, they did so in small amounts or only to people they knew in order to avoid attracting attention to their homes. He said that more frequently, dealers went to locations away from their residences that were known "open markets" for drugs. He said dealers typically stayed in such areas until they sold their supply. He said the Defendant's home was 5.2 miles and nine minutes by car from the location of the arrest.

Lieutenant Mackall testified that in his opinion, a person who was stopped with $700 cash and approximately four grams of crack cocaine would be a drug "seller," not a drug user. He said that in his opinion, a person who lived "miles away" who had over $700 cash, more than a gram of cocaine, and no drug paraphernalia was a drug "seller," not a drug user.

On cross-examination, Lieutenant Mackall testified that although his salary was paid by the Metro Nashville government, he did not receive additional compensation for testifying as an expert witness for the State. He said that he had testified as a State's witness around fifteen times and that based upon the facts of those cases, he thought each defendant was a drug seller.

Lieutenant Mackall agreed that the percentage of cocaine in crack cocaine varied based upon the other ingredients used to make it. He said the crack pipe he used during his demonstration was authentic but was not from an actual arrest. He agreed that liquor bottles, a car antenna, a pipe, glass, metal, and a beverage can could be used to smoke crack cocaine. He agreed he arrived at the scene after the Defendant's arrest.

Metro Nashville School Security Operations Manager Steve Keel testified that Cameron Middle School was located at 1034 First Avenue South. He identified the school in an aerial photograph.

Tennessee Bureau of Investigation Forensic Scientist Ellen Carpenter testified that she analyzed evidence collected in this case. She said she analyzed a substance weighing 3.76 grams and determined it was cocaine base. She said she did not analyze an additional 1.7 grams of a substance submitted to the laboratory. On cross-examination, Ms. Carpenter said the State's testing protocols did not require that she determine the quantity of pure cocaine in the substance she tested.

David Kline, the manager of the Metro Nashville Planning Department's Mapping Division, testified that he printed a map for the prosecutor relative to this case. Referring to the map, he identified the property that comprised Cameron Middle School. He identified a computer-generated line representing a 1000' boundary beyond the school property. He also identified the point of the arrest on the map and said it was approximately 591' from the school property.

On cross-examination, Mr. Kline testified that although he only marked one drug-free school zone on the map, others were depicted. He agreed that they were concentrated in residential areas of the city and that finding a location "just outside the inner loop" that was not within a drug-free school zone would be difficult.

The Defendant did not offer proof. The jury found the Defendant guilty of possession with the intent to deliver 0.5 gram or more of a substance containing cocaine in a drug-free school zone.

At the sentencing hearing, the presentence report was received as an exhibit and reflected that the fifty-nine-year-old Defendant claimed the confidential informant gave him $20 for drugs they had used the previous day. He acknowledged he had drugs and cash when he was arrested and said he had won $1000 earlier that day by playing the lottery and had purchased drugs with a portion of the money. He said he was a heavy crack cocaine user. The presentence report listed the Defendant's previous convictions spanning his entire adult life: resisting arrest, casual exchange, five counts of driving while his license was suspended, possession of one-half ounce or more of a Schedule VI controlled substance, two counts of possession of less than 0.5 gram of cocaine, two counts of misdemeanor theft, "selling drugs," fraud, two counts of burglary, armed robbery, robbery, two counts of aggravated assault, an undefined weapons offense, possession of drugs, possession of narcotics equipment, disorderly conduct, and attempt to commit an unspecified felony. The Defendant's parole was revoked five times, and he absconded from community supervision on one occasion. He had additional pending cases involving drug offenses in a drug-free school zone. He obtained a GED during prior incarceration. His most recent employment was as a laborer for a food service company. The State offered as exhibits certified copies

of some of the Defendant's prior convictions in order to establish that the Defendant was a Range II offender.

In sentencing the Defendant, the trial court was heavily influenced by the Defendant's prior history of criminal convictions and behavior. The court noted that the sentencing range was twenty-five to forty years and that 100% service of the sentence was required. It imposed a twenty-eight-year sentence. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417. Drug transactions "occur[ing] on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, [or] secondary school . . . shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." *Id.* § 39-17-432(b)(1).

The Defendant argues that Officer Knight's testimony about seeing a hand-to-hand transaction was unreliable because Officer Knight viewed it through a dark, tinted window, from 50' to 100' away, and around 8:30 p.m., which was after nightfall. He likewise notes

that Officer Knight did not see money or any objects change hands and that the Defendant did not possess typical "tools of the drug trade" at the time of the arrest.

The evidence, viewed in the light most favorable to the State, shows that Officer Knight witnessed a hand-to-hand transaction between the Defendant, whom he recognized from previous knowledge, and another person. The Defendant possessed $777 in small-denomination currency, 4.3 grams of crack cocaine composed of approximately twenty-one pieces, and a $20 bill with the serial number of a bill from the "buy money" the police designated for its buy-bust operation. The Defendant did not have any drug paraphernalia that might indicate he possessed the drugs for his personal use. The amount of money and crack cocaine he possessed was much larger than those a typical drug user would possess. The transaction between the Defendant and the other person took place within 1000' of Cameron Middle School. We conclude that the evidence is sufficient to support the conviction. The Defendant is not entitled to relief on this basis.

## II

## Mistrial

The Defendant contends that the trial court erred in failing to declare a mistrial after being informed that a juror slept during part of Lieutenant Mackall's testimony. The State contends that as a result of the Defendant's failure to request a mistrial, this court is limited to consideration of plain error and that in any event, none occurred.

The record reflects the following exchange occurred between defense counsel and the trial court:

> [DEFENSE COUNSEL]: And, Your Honor, we had an issue, [my co-counsel] pointed out, with juror number three sleeping through much of Lieutenant Mackall's testimony. I don't necessarily know that we need to ask him to be removed or not, but, at least, wanted to bring it to your attention and allow you to make a decision on it.
>
> THE COURT: Okay, I'll take it under consideration.

The Defendant did not request a mistrial during this exchange or otherwise during the trial. The Defendant first alleged in the motion for a new trial that the court erred in failing to grant a mistrial due to a sleeping juror. He alleged in the motion for a new trial only that the matter was brought to the court's attention at the trial, not that he made a contemporaneous motion for a mistrial.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

Regarding the State's argument that the Defendant has waived the issue by failing to move for a mistrial contemporaneously with the occurrence about which he complains, we acknowledge that panels of this court have reached different conclusions regarding whether a motion for a mistrial must be made contemporaneously with the occurrence of the facts upon which a mistrial is sought. *See, e.g.*, *State v. Robinson*, 971 S.W.2d 30, 42-43 (Tenn. Crim. App. 1997) ("The defendant's failure to make a contemporaneous objection or motion for mistrial constitutes a waiver of the issue [regarding the denial of a mistrial, raised first in the motion for a new trial,] absent the existence of plain error."); *State v. Johnny L. Burns*, No. M2008-01374-CCA-R3-CD, 2009 WL 2030425, at *4 (Tenn. Crim. App. July 13, 2009) (concluding that pursuant to *Robinson*, an issue regarding failure to grant a mistrial must be preserved by a contemporaneous objection or a contemporaneous motion for a mistrial but nevertheless reviewing the issue on the merits because the trial court did not deny the non-contemporaneous motion based upon waiver); *State v. Tracey Dion Payne*, No. M2000-02584-CCA-R3-CD, 2002 WL 1885062, at *7 n.5 (Tenn. Crim. App. Aug. 16, 2002) (concluding that *Robinson* "does not mandate that a complaining party make a contemporaneous motion for a mistrial in order to preserve an issue for appeal" and that an issue is preserved by "a contemporaneous objection to the objectionable behavior"); *cf. State v. Michael Maples*, No. E2009-00400-CCA-R3-CD, 2010 WL 2924203, at *4 (Tenn. Crim. App. July 27, 2010) (concluding without citing *Robinson* that the issue of the trial court's failure to grant a mistrial was waived because the defendant failed to object contemporaneously or make a contemporaneous request for a mistrial relative to a witness's testimony, despite the defendant's non-contemporaneous request for a mistrial during jury deliberations). We likewise note the Supreme Court's admonition in *United States v. Dinitz*, 424 U.S. 600, 609 (1976), that "traditional waiver concepts have little relevance where the defendant must determine whether or not to request or consent to a mistrial in response to judicial or prosecutorial error."

In this case, however, we are not called upon to determine whether the principle of waiver is operative due to the Defendant's failure to make a contemporaneous motion for a mistrial. A mistrial was not the appropriate potential remedy for the sleeping juror issue. The record reflects that the trial court empaneled fourteen jurors at the beginning of the case, meaning the court empaneled two extra jurors in order to select and excuse two jurors as

alternates before deliberations began at the end of the trial. *See* Tenn. R. Crim. P. 24(f)(2)(A)-(B) (providing alternative methods that permit the court to empanel one or more jurors beyond the regular jury of twelve). If the court had determined that one of the jurors slept through witness testimony, it could have excused the juror for cause, leaving thirteen jurors to hear the proof. The issue of whether the court should have excused the allegedly sleeping juror for cause has not been raised in this appeal, and in any event, the record does not contain sufficient information for appellate review of this issue.

We conclude that a mistrial was not the appropriate remedy for addressing the Defendant's grievance. Because no situation was presented that called for granting a mistrial, the trial court did not err in failing to grant a mistrial. The Defendant is not entitled to relief on this basis.

## III

### Expert Witness

The Defendant contends that the trial court erred in permitting Lieutenant Mackall to testify as an expert witness beyond the scope of his expertise in street-level drug sales. The State responds that Lieutenant Mackall was qualified to testify to his opinions based upon his training, education, and experience. We conclude that the court did not err in admitting the evidence.

Tennessee Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 provides in pertinent part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Whether to admit expert testimony is within the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). A trial court's ruling will be reversed only if the court abused its discretion, which requires a showing that the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an

injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

Lieutenant Mackall had twenty-two years of law enforcement experience, supervised other drug officers, and participated in street-level drug interdiction operations. He testified that he had completed training relative to narcotics, confidential informants, interview and interrogation techniques, search warrants, gangs, and other unspecified drug-related topics. He had trained officers in buy-bust operations, search warrants, and "anything dealing with anything from street level to long-term investigation." He estimated that he had been involved as an officer or supervisor in over 1000 buy-bust operations. He had testified previously as an expert witness in street-level drug sales in more than twelve drug prosecutions. His previous expert testimony, which had always been for the State, had included matters relevant to small quantities of crack cocaine and marijuana and how they were used, packaged, sold, and "things of that nature." He acknowledged that although he had not conducted research on these subjects relative to cocaine, he had job experience related to cocaine. He had conducted research relative to "new and upcoming drugs."

The Defendant complains that Lieutenant Mackall exceeded the scope of his expertise by testifying about the physiological effects on the nervous system of powder cocaine as compared with crack cocaine, the mechanics of smoking crack cocaine with a pipe, the intravenous use of cocaine, the habits of crack cocaine users relative to possession of money and purchases of small quantities of drugs, and the patterns of drug dealers regarding the distance between their homes and the locations they sold drugs. The Defendant also complains that Lieutenant Mackall exceeded the scope of his expertise by testifying to his opinion that a person arrested with $700 and over four grams of crack cocaine would be a drug dealer and not a drug user.

"When the State establishes that an officer possesses the necessary training, experience, and familiarity with the illicit drug trade, the officer may testify about matters relating to the business of buying, selling, trading, and use of illegal drugs pursuant to Rule 702 of the Tennessee Rules of Evidence." *State v. Elliot*, 366 S.W.3d 139, 147 (Tenn. Crim. App. 2010); *see, e.g.*, *State v. Gene Luigi Atkins*, W2013-02544-CCA-R3-CD, 2014 WL 4792798, at *6 (Tenn. Crim. App. Sept. 25, 2014), *perm. app. denied* (Tenn. Jan. 16, 2015), *State v. Telly Lamont Booker*, No. E2011-01915-CCA-R3-CD, 2013 WL 1342491, at *4 (Tenn. Crim. App. Apr. 3, 2013) (citing additional authorities), *perm. app. denied* (Tenn. June 12, 2013). The record reflects that Lieutenant Mackall possessed specialized knowledge that, if accepted by the jury, offered substantial assistance in understanding the evidence and determining the facts at issue. His testimony about which the Defendant complains pertained to Lieutenant Mackall's observations of and conversations with drug users and dealers, his considerable training, and his extensive experience as a police officer

assigned to detecting drug trafficking. We conclude that his testimony was not outside the bounds of his expertise, and the trial court did not err in admitting it. The Defendant is not entitled to relief on this basis.

## IV

## Sentencing

The Defendant contends that his twenty-eight-year sentence, with a minimum required service of twenty-five years, is unconstitutional as applied to him because it violates his right to be free from cruel and unusual punishment pursuant to the Eighth Amendment and article I, section 16 of the Tennessee Constitution. He argues that given his age of sixty years, the sentence is disproportionate because it effectively constitutes a life sentence for a nonviolent crime.

As we have noted, the Defendant was a Range II offender and had numerous prior convictions. The prior convictions span his adult life, with the only meaningful respites aligning with periods of incarceration. The trial court imposed a sentence on the lower end of the twenty-five to forty year sentencing range.

This court has rejected constitutional challenges of this nature to sentences under the Drug-Free School Zone Act. *See, e.g.*, *State v. Smith*, 48 S.W.3d 159, 170-73 (Tenn. Crim. App. 2000); *State v. Jenkins*, 15 S.W.3d 914, 919-20 (Tenn. Crim. App. 1999). Relative to increased sentences imposed upon repeat offenders, we note the State's interest "'in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law.'" *Smith*, 48 S.W.3d at 173 (quoting *Rummel v. Estelle*, 445 U.S. 263, 276 (1980) (holding that a life sentence following a third nonviolent felony conviction did not violate the Eighth Amendment)).

Our supreme court has said that despite the similar language of the Eighth Amendment and article I, section 16 of the Tennessee Constitution, the similarity "does not foreclose" a more expansive interpretation of the state constitutional provision. *State v. Black*, 815 S.W.2d 166, 188 (Tenn. 1991); *State v. Harris*, 844 S.W.2d 601, 603 (Tenn. 1992). In the context of non-capital sentencing, our supreme court has said the proportionality inquiry under article I, section 16 requires an initial comparison of the sentence imposed with the crime committed. *Harris*, 844 S.W.2d at 603.

Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends–the sentence is constitutional. In those

rare cases where this inference does arise, the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions.

*Id.* Comparing the Defendant's twenty-eight-year sentence and his commission of the offense of possession of cocaine in a drug-free school zone in circumstances indicating he was an active, ongoing participant in the drug trade, no inference of gross disproportionality arises. Because no gross disproportionality appears, the inquiry ends. The Defendant is not entitled to relief on this basis.

The judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE